**UNITED STATES of America, Appellee,**

v.

**Derrick Lance BLACKMAN, Appellant.**

**No. 88–2771.**

United States Court of Appeals,
Eighth Circuit.

Submitted April 10, 1990.

Decided June 4, 1990.

Rehearing and Rehearing En Banc Denied
Aug. 17, 1990.

F. Lee Bailey, Boston, Mass., for appellant.

Linda L. Parker, Kansas City, Mo., for appellee.

Before McMILLIAN and FAGG, Circuit Judges, and HEANEY, Senior Circuit Judge.

McMILLIAN, Circuit Judge.

Derrick Lance Blackman appeals from a final judgment entered in the District Court[1] for the Western District of Missouri upon a jury verdict finding him guilty of possession with intent to distribute cocaine in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(A) (Count I) and money laundering in violation of 18 U.S.C. § 1956 (Counts II–VI). The district court sentenced Blackman under the Federal Sentencing Guidelines to 25 years under Count I and 5 years each for Counts II–VI, to be served concurrently. On appeal, Blackman argues that: (1) the district court erroneously denied his motion to suppress evidence obtained from a search of his luggage and incriminating statements made to arresting officers, (2) the government's evidence on the money laundering charges was insufficient to sustain a guilty verdict, (3) the jury instructions on the money laundering counts were inadequate, (4) the district court erroneously admitted into evidence Blackman's pistol and certain hearsay statements, (5) his sentence under the Sentencing Guidelines violates his constitutional right to due process, and (6) he was denied effective assistance of counsel. We affirm.

## I. Background

Between May 10 and 12, 1988, the Kansas City Police Department and the FBI received several phone calls from an anonymous informant purporting to have inside information on the drug activity of Derrick Lance Blackman also known as Darnell Draper, Thomas McElroy, and Donald Summers. The informant told police that Blackman would be arriving in Kansas City within the next few days on an Amtrak train from Los Angeles with large amounts of cocaine. The informant thought that Blackman would be transporting the cocaine in wheel rim boxes. The informant described Blackman as a 25–year–old black male with a large build, wanted in several states, possibly dangerous, and residing in

1. The Honorable Howard F. Sachs, United States District Judge for the Western District of Missouri.

the area of 38th & Warwick Streets in Kansas City. The informant also told police that Blackman owned a black, dual rear-wheel truck located at Clay's Corvettes on 63rd Street in Kansas City and that Blackman owned a wheel rim shop across from an Amtrak station in Torrence, California.

Police verified some of the information about Blackman supplied by the informant. A black, dual rear-wheel pickup truck was parked near Clay's Corvettes, with Missouri registration in the name of Donald Summers, one of Blackman's aliases. Police confirmed the existence of a wheel rim shop across from the Amtrak station in Torrence, California. They also learned from the Los Angeles Police Department that Blackman a/k/a Darnell Draper had been involved in a homicide in the Los Angeles area, but he was not at that time wanted there for any crime.

Police conducted surveillance of the Kansas City Amtrak station on the mornings of May 12 and 13, 1988, looking for a black male who matched a photograph of Derrick Blackman the police had obtained from the Los Angeles Police Department. On May 13, a police officer observed a man whom he suspected to be Blackman depart a train arriving from Los Angeles carrying two bags and a small toiletry bag. The police observed the suspect approach a taxi driver he appeared to know, make a phone call, put his luggage in the trunk of the taxi, and drive away in the back seat of the taxi.

Police Officer Pelter followed the taxi in an unmarked police vehicle, and got close enough to the taxi to compare the passenger to the photograph of Blackman. He then ordered a marked police vehicle to stop the taxi. Officer Pelter approached the passenger side of the taxi and began questioning Blackman about where he was going and whether he had any luggage. Blackman told Pelter he was going to his girlfriend's house but would not divulge the address. He denied having any luggage. Blackman produced a California

driver's license in the name of Donald Summers. After radioing his sergeant, Officer Pelter placed Blackman under arrest and asked to search his luggage. Blackman refused to consent to a search and told Pelter he would have to get a warrant.

More officers arrived on the scene, and the taxi driver eventually opened the trunk of the taxi.[2] As Sergeant Pierce transferred Blackman's three bags to a police car pending issuance of a warrant to search their interior, she felt brick-shaped objects inside Blackman's red bag which resembled boxes she had seen used to transport kilograms of cocaine. All this information was included in the search warrant affidavit. The warrant was issued and executed. In Blackman's red bag, police found three kilograms of cocaine powder, over 800 grams of crack cocaine, a nation-wide pager system, and a battery pack for a cellular mobile telephone. In the other bag police recovered six more kilograms of cocaine powder.

In addition to the evidence found in Blackman's luggage, the government introduced evidence seized from a valid search of Blackman's apartment and testimony from various narcotics experts. In Blackman's apartment, police found a .22 caliber pistol, a pager system, more cocaine, a "drug ledger," and a wheel rim box. A narcotics expert testified that the cocaine found on Blackman was worth from 1 to 3 million dollars and that only an upper-level dealer would be carrying that amount of cocaine.

In addition to charges of possession with intent to distribute cocaine (Count I), Blackman was charged with five counts of money laundering in violation of 18 U.S.C. § 1956. At trial the government introduced the following evidence in support of those charges. On four separate occasions, Blackman, using the names Darnell Draper and Thomas McElroy, wired money via Western Union to a woman in Inglewood, California, a suburb of Los Angeles (Counts III–VI). The four wires, sent over

---

**2.** One of the grounds upon which the government justifies the search is consent. Because we find the search valid on other grounds, we

have not given factual detail surrounding the eventual consent given by the driver of the taxi to search the trunk.

a four-month period, totalled $11,000. A narcotics expert told the jury that drug traffickers commonly use Western Union to transfer cash needed in their business. The fifth charge (Count II) involved an arrangement between Blackman and Citadel Auto Sales to transfer title in Blackman's truck from Thomas McElroy to Donald Summers. According to the government's evidence, Blackman approached Citadel Auto Sales and paid them some $4,000 in exchange for papers purporting to sell the truck to Donald Summers with a lien attached. A narcotics expert testified that drug traffickers favor liens because a lien shields the motor vehicle from seizure should the trafficker be arrested or stopped.

## II. Motion to Suppress

Before trial, Blackman moved to suppress evidence obtained from the search of his luggage and the two statements about his luggage he made to police at the time of his arrest. Blackman's motion was denied. He appeals on the grounds that the search violated his fourth amendment right to be free from unreasonable searches and that the statements were made before he was advised of his *Miranda* rights. *See Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

## A.

We first address the validity of the search of Blackman's luggage. Blackman essentially challenges the validity of three separate searches. He argues: (1) the police did not have probable cause to search the trunk of the taxi without a warrant; (2) Sergeant Pierce's touching of the bags constitutes a warrantless search which does

not fit into any recognized exception to the warrant requirement; and (3) the search warrant affidavit included false statements and material omissions which render the warrant invalid. For the reasons discussed below, we reject all three of Blackman's arguments.

■ The search of the trunk and the seizure of the luggage contained therein are justified under the automobile exception to the warrant requirement.[3] *See Chambers v. Maroney,* 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970). While the police could not have justified a search of the *interior* of the bags found in the trunk under the automobile exception to the warrant requirement, *Arkansas v. Sanders,* 442 U.S. 753, 99 S.Ct. 2586, 61 L.Ed.2d 235 (1979), seizure of the luggage from the trunk was lawful. In *Arkansas v. Sanders,* a case involving nearly identical facts, the Supreme Court noted, "[h]aving probable cause to believe that contraband was being driven away in the taxi, the police were justified in stopping the vehicle, searching it on the spot, and seizing the suitcase they suspected contained contraband." 442 U.S. at 761, 99 S.Ct. at 2592 (citing *Chambers v. Maroney,* 399 U.S. at 52, 90 S.Ct. at 1981); *see also United States v. Chadwick,* 433 U.S. 1, 13 n. 8, 14, 97 S.Ct. 2476, 2485 n. 8, 2485, 53 L.Ed.2d 538 (1977) (seizure of a footlocker thought to contain contraband from the trunk of an automobile, although not challenged on appeal, was a lesser intrusion into fourth amendment values than the search of its interior). Under the totality of the circumstances, we find that the police had probable cause to believe the trunk of the taxi contained evidence of illegal drug trafficking.[4] Blackman argues that probable

---

3. Contrary to the government's assertion, the search of the trunk cannot be justified as a lawful search incident to arrest. *See New York v. Belton,* 453 U.S. 454, 462, 101 S.Ct. 2860, 2865, 69 L.Ed.2d 768 (1981). Because the trunk was not within the reach of the detainee, it posed no threat to the arresting officer and therefore was outside the scope of a search incident to arrest. *See Chimel v. California,* 395 U.S. 752, 763, 89 S.Ct. 2034, 2040, 23 L.Ed.2d 685 (1969).

4. Blackman argues that the totality of the circumstances test in *Illinois v. Gates,* 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983), does not apply to warrantless searches. Instead he urges us to apply the more stringent two-prong *Aquilar/Spinelli* test. *See Aquilar v. Texas,* 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964); *Spinelli v. United States,* 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969). While it is true that the *Gates* test measured probable cause to obtain a warrant, we find that it is equally applicable to measure probable cause when no warrant is

cause did not exist because the police were looking for a man transporting cocaine in wheel rim boxes and his bags were not large enough to contain a wheel rim box. This discrepancy did not significantly detract from the police's knowledge about Blackman's criminal activity.[5] Virtually every other fact supplied by the informant had been corroborated by the time police first observed Blackman, including his arrival in Kansas City on an Amtrak train from Los Angeles. As the Supreme Court has noted "[i]t is enough, for purposes of assessing probable cause, that 'corroboration through strict sources of information reduced the chances of a reckless or prevaricating tale,' thus providing 'a substantial basis for crediting the hearsay.'" *Illinois v. Gates*, 462 U.S. 213, 244–45, 103 S.Ct. 2317, 2335, 76 L.Ed.2d 527 (1983) (quoting *Jones v. United States*, 362 U.S. 257, 269, 271, 80 S.Ct. 725, 735, 736, 4 L.Ed.2d 697 (1960)).

We need not address the validity of Sergeant Pierce's handling of Blackman's luggage because the affidavit contains sufficient information to support a finding of probable cause to search the interior of the bags without the two sentences devoted to the brick-like objects she felt inside the red bag. Therefore, we decline to address whether Sergeant Pierce's conduct constitutes a search or whether we would apply a "plain touch" exception in this case. *See United States v. Williams*, 822 F.2d 1174 (D.C.Cir.1987) (plain view exception encompasses "plain touch").

■ Nor do we find that any omissions or misleading statements contained in the affidavit invalidate the warrant. The affidavit stated that Sergeant Pierce felt "several" brick-sized objects in Blackman's red bag. At the suppression hearing, Sergeant

Pierce testified that she could not be sure she felt more than one object in the bag. Although her statement may have misled the magistrate, it is immaterial to his finding of probable cause. Blackman also argues that if the magistrate had been told that police were looking for a man transporting cocaine in wheel rim boxes he would not have issued the warrant. We disagree. The district court found that the magistrate's decision to issue the warrant would not have been affected had he known about the wheel rim boxes. This finding is not clearly erroneous. *See United States v. Flett*, 806 F.2d 823, 826 (8th Cir.1986) (district court's findings of fact on motion to suppress evidence are reviewable under the clearly erroneous standard).

We therefore uphold the validity of the search of Blackman's luggage and the admission of evidence obtained as a result of that search.

**B.**

■ We next address the denial of Blackman's oral motion to suppress two incriminating statements he made to arresting officers before he was advised of his *Miranda* rights. *See Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Blackman argues that his denial of having luggage and his refusal to consent to a search were statements elicited during custodial interrogation without the benefits of *Miranda* warnings, and therefore should have been suppressed. Although we tend to agree with Blackman that the district court erred in refusing to suppress the statements, we hold that the error was harmless in light of the overwhelming evidence submitted against Blackman on the cocaine charge.[6]

needed. We are not persuaded by Blackman's argument that the rationale behind the totality of the circumstances test in *Gates* is unique to the issuance of warrants.

5. Furthermore, even if the police only had reasonable suspicion to justify an investigatory stop, those suspicions clearly rose to probable cause when Blackman confirmed his identification and denied having any luggage. *See United States v. Eisenberg*, 807 F.2d 1446, 1450 (8th Cir.1986) (police may stop a moving vehicle to

investigate a reasonable suspicion that the occupant is engaged in criminal activity); *see also Reid v. Georgia*, 448 U.S. 438, 100 S.Ct. 2752, 65 L.Ed.2d 890 (1980).

6. Blackman's detention was far from routine. *Contra Berkemer v. McCarty*, 468 U.S. 420, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984) (questions posed to a motorist after a routine traffic stop do not constitute custodial interrogation). To the contrary, Blackman was the center of an investigation. *See United States v. Carter*, 884

Contrary to the government's assertion, we are not limited to the plain error standard on this matter. *See* Government's Brief at 27. The government argues that because defense counsel failed to make a timely objection to the admission of Blackman's statements, we can only reverse if the admission of the two statements amounts to plain error. A closer examination of the record would have reminded the government that, at the outset of trial, defense counsel asked for, and was granted, a continuing objection to all evidence he sought to suppress in his pretrial motion. Transcript of Proceedings, Vol. III, 551–52. This, as the district court noted, preserves the issue for appeal. *Id.* at 552.

A review of the entire record, exclusive of any reference to the two incriminating statements, convinces us beyond a reasonable doubt that their erroneous admission was harmless. *See Jones v. Wyrick,* 542 F.2d 1013, 1014 (8th Cir.1976), *cert. denied,* 430 U.S. 956, 97 S.Ct. 1603, 51 L.Ed.2d 807 (1977). *See also Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). The evidence against Blackman relevant to his intent to distribute cocaine, the element to which the statements are relevant, was overwhelming. Blackman was found in possession of over nine kilograms of cocaine powder and over 800 grams of crack cocaine. At the time of his arrest, Blackman was carrying some $2,000 in cash. Blackman's apartment contained devices commonly used in drug distribution: four wheel rim boxes; baking soda; a .22 caliber pistol; and a "drug ledger." Blackman testified in his defense that he did not know the cocaine was in his luggage. He testified that he was transporting the blue bag as a favor for a friend. As to the cocaine in the red bag, Blackman's testimony only inferred that his friend had placed it there without his knowledge. In light of all the evidence, we hold that the admission of Blackman's statements to the officers concerning his luggage was harmless error.

### III. Money Laundering

Blackman appeals the district court's denial of his motion for acquittal on the five money laundering counts, and challenges for the first time on appeal the adequacy of the jury instructions on those counts. Blackman argues that the government failed to produce evidence from which a juror could find beyond a reasonable doubt that the financial transactions underlying the charges involved proceeds from drug trafficking. Blackman also argues that the instructions failed to adequately inform the jury of the government's burden on this element. We reject both arguments.

When considering a challenge to the sufficiency of the evidence to convict, we view the evidence in a light most favorable to the government. *United States v. O'Connell,* 841 F.2d 1408, 1424 (8th Cir.1988), *cert. denied,* —— U.S. ——, 109 S.Ct. 799, 102 L.Ed.2d 790 (1989). If a juror could reasonably infer from the evidence presented at trial that Blackman had engaged in money laundering proscribed by 18 U.S.C. § 1956, we must uphold the conviction.

We turn first to the legal issues Blackman raises about the scope of 18 U.S.C. § 1956. The government charged Blackman under 18 U.S.C. § 1956(a)(1)(A) and 18 U.S.C. § 1956(a)(1)(B)(i). According to these provisions, the government has the burden of proving beyond a reasonable doubt that Blackman knowingly conducted a financial transaction which involved the proceeds of drug distribution and that he did so either with the intent to promote his drug business or with knowledge that the transaction was designed to disguise the nature or source of those proceeds. Blackman argues that (1) the transfer of title on his pickup truck does not constitute a financial transaction under the statute;[7] (2) the government must trace the proceeds

---

F.2d 368 (8th Cir.1989). Numerous officers were present at the time of questioning to arrest Blackman for transporting drugs the police firmly believed to be in the trunk of the taxi. A reasonable person in Blackman's shoes would not have felt free to leave the scene.

7. There is no question that the four wire transfers in Counts III–VI are "financial transactions," which by definition includes the movement of funds by wire. 18 U.S.C. § 1956(c)(4).

involved in the transactions to a particular drug sale; and (3) the government cannot satisfy its burden of proof on the proceeds element by merely showing that a drug trafficker has no other legitimate source of income.

■ Turning first to the element of a "financial transaction," we are convinced that Blackman's arrangement with Citadel Auto Sales constitutes a financial transaction within the scope of 18 U.S.C. § 1956. The statute defines "financial transaction" very broadly. *See* S.Rep. No. 433, 99th Cong. 2d Sess. 12–13 (1986). The term includes the purchase, sale or disposition of any kind of property as long as the disposition involves a monetary instrument. For example, a deposit of money in a bank and the subsequent use of that money to purchase a house are two transactions within the scope of the statute. *Id.* In this case the transaction between Blackman and Citadel Auto Sales purported to be a sale of the truck from Citadel to Donald Summers. The government submitted evidence that Blackman paid Citadel to conduct the transaction. Accordingly, we find that the transaction in question fits squarely within the coverage of Section 1956 and is precisely the type of transaction that Congress intended to criminalize.

■ Unfortunately neither the statute nor its legislative history precisely addresses the requirement that the money involved in the transaction represent proceeds from drug trafficking.[8] The government relied on evidence of Blackman's involvement in drug trafficking and his lack of any legitimate source of income to raise the inference that the money wired to Los Angeles and paid to Citadel Auto Sales represented proceeds from drug distribution. While the government can point to no specific drug sale that produced the money,[9] we do not believe that the govern-

ment's evidence fails to make out a claim of money laundering under 18 U.S.C. § 1956. We do not read the statute to require that the government trace the proceeds to a *particular* sale. We do agree with Blackman that the government cannot rely *exclusively* on proof that a defendant charged with using proceeds from an unlawful activity has no legitimate source of income. However, as the Third Circuit noted in *United States v. Massac*, 867 F.2d 174 (3d Cir.1989), evidence of a defendant's use of wire service to transfer cash to Haiti, combined with evidence of defendant's drug trafficking, is sufficient to sustain a conviction of money laundering under 18 U.S.C. § 1956(a)(1)(B)(i).

We must remember that the government's burden on a particular element of the offense may be satisfied by circumstantial evidence as long as it is sufficient to prove that element beyond a reasonable doubt. In *United States v. Matra*, 841 F.2d 837, 841 (8th Cir.1988), for example, we noted that large sums of unexplained currency is circumstantial evidence of intent to distribute cocaine. Reviewing the entire record, we conclude that the government presented sufficient circumstantial evidence from which a juror could infer each element of the money laundering offense beyond a reasonable doubt. The government introduced undisputed evidence of Blackman's use of Western Union to transfer $11,000 to Los Angeles. The jury heard testimony from an expert witness explaining drug dealers' common use of the wire services in furtherance of their drug activities. The jury also heard from an expert who testified that drug dealers prefer to drive automobiles which are encumbered by a lien so as to protect the automobile from police seizure. Accordingly, we hold that the district court did not err in denying Blackman's motion for acquittal on the money laundering counts.

---

8. It is on this element that Blackman also challenges the adequacy of the jury instructions. We review the merits of Blackman's challenge to the jury instructions under the plain error standard because he failed to object at trial. *United States v. Young*, 702 F.2d 133, 136 (8th Cir.1983). Under this standard, and because of our holding on the sufficiency of the govern-

ment's evidence on the proceeds elements, we find Blackman's challenge to the jury instructions without merit.

9. Each transaction occurred well before Blackman was found with the cocaine constituting the violation of 21 U.S.C. § 841 in Count I.

## IV. Admissibility of Pistol and Certain Hearsay Statements

Blackman challenges the admissibility of a pistol seized from his apartment and certain hearsay statements elicited from two witnesses on the government's re-direct examination. Neither challenge warrants reversal of Blackman's conviction.

■ Contrary to Blackman's assertion, presence of a firearm is relevant to the element of Blackman's intent to distribute cocaine. *United States v. Brett*, 872 F.2d 1365, 1370 (8th Cir.) (citing *United States v. LaGuardia*, 774 F.2d 317, 320 (8th Cir. 1985)), *cert. denied*, —— U.S. ——, 110 S.Ct. 322, 107 L.Ed.2d 312 (1989). Nor do we find that the district court abused its discretion by finding that the pistol's relevance outweighed its possible prejudice. Therefore, we hold that the district court did not err in admitting the pistol into evidence.

■ Because defense counsel failed to object to the admission of the hearsay statements, we review their admission under the plain error standard. *United States v. Miller*, 725 F.2d 462, 467 (8th Cir.1984). The admission of hearsay statements elicited from two government witnesses on re-direct was not plain error. In each instance, defense counsel opened the door by questioning the witness about the nature of the transaction between Blackman and Citadel Auto Sales.[10] On re-direct, the government was merely trying to establish the foundation for each witness' opinion. We have often held admissible evidence which is adduced on re-direct to clarify an issue raised on cross-examination even if it would otherwise be inadmissible. *See, e.g., United States v. Womochil*, 778 F.2d 1311, 1315 (8th Cir.1985). Furthermore, even if they were erroneously admitted, the statements did not seriously affect Blackman's substantial rights. Cross-examination had already revealed that each witness thought the transaction to be a "sham." The government's re-direct did not significantly bolster that testimony.

## V. Sentencing

Blackman was sentenced according to the Federal Sentencing Guidelines and was assigned a base offense level of 36. The district court increased his level by two points, from 36 to 38, under Guideline § 3C1.1 which provides: "If the defendant willfully impeded or obstructed, or attempted to impede or obstruct the administration of justice during the investigation or prosecution of the instant offense, increase the offense level from Chapter Two by 2 levels." The district court, relying on the Presentence Report, granted the two-level increase because Blackman used an alias during a detention hearing and a pre-bail interview. On appeal, Blackman challenges the constitutionality of the Sentencing Guidelines, on their face and as applied to him, under the due process clause of the fifth amendment. Blackman argues that the Guidelines deprive judges of discretion in sentencing, thereby depriving criminal defendants of their right to have a court

---

10. On cross-examination defense counsel asked Sergeant Bass:

Q: Okay. Did your investigation reveal that this is a sham document?
A: Yes sir.

On re-direct, the following occurred:
Q: I believe you indicated that your investigation, in response to a question by defense counsel, that the investigation revealed this was a sham transaction?
A: That is our belief, yes ma'am.
Q: In fact was that stated by Mr. Wright?
A: Yes, ma'am.

(Transcript of Proceedings, Vol. II, 225, 226–27). Later defense counsel asked Special Agent Wissel:
Q: Okay. Did you talk to a police officer by the name of Bass during your investigation?
A: Yes. I had spoken with Sergeant Bass.
Q: Did you learn that, at least it was his opinion that the transfer was a sham?
A: On the Silverado truck, yes it was.

On re-direct, the government asked:
Q: When the question was asked whether you understood Sgt. Bass to have an opinion that this was a sham transaction, you said yes. Do you, yourself, have an opinion?
A: Yes, I do. Don Wright told me it was a sham transaction.
Q: And did Don Wright indicate to you whether he received any money for this?
A: Yes, he did. He received approximately $4,200.00.

(Transcript of Proceedings, Vol. III, 331–32, 335–36).

weigh the aggravating and mitigating factors affecting their sentence. Blackman also argues that he was unconstitutionally deprived of an evidentiary hearing on the elements of Guideline § 3C1.1, namely his intent to obstruct justice and whether his use of an alias constituted a material falsehood.

■■■ We turn first to Blackman's due process arguments. The Sentencing Guidelines do not *per se* violate a criminal defendant's right to due process under the fifth amendment. We have consistently upheld the Guidelines against allegations that they unconstitutionally eliminate a sentencing judge's discretion, and do so again in this case. *See United States v. Fuller,* 887 F.2d 144 (8th Cir.1989); *United States v. Williams,* 879 F.2d 454 (8th Cir.1989); *United States v. Brittman,* 872 F.2d 827 (8th Cir.), *cert. denied,* — U.S. —, 110 S.Ct. 184, 107 L.Ed.2d 140 (1989).

■■■ We turn next to the two-level increase under Guideline § 3C1.1. Our review of the sentence imposed by the district court is governed by 18 U.S.C. § 3742(d) (1988). We will reverse Blackman's sentence only if it was imposed as a result of an incorrect application of the sentencing guidelines. 18 U.S.C. § 3742(d)(2).

■■■ Blackman's argument that he was entitled to an evidentiary hearing on whether his use of an alias was a material falsehood raises the question of whether a criminal defendant's use of an alias can constitute an obstruction of justice under Guideline § 3C1.1 without a specific finding that it somehow impeded the investigation or the proceeding. Blackman argues that such a finding of actual prejudice to the government is required and that he was entitled to produce evidence that the au-

thorities knew all along that he went by several aliases.[11] *See United States v. Brett,* 872 F.2d 1365 (8th Cir.) (affirming a two-level increase under Guideline § 3C1.1 based on a finding that the defendant's use of an alias cost the government "time, manpower and money"), *cert. denied,* — U.S. —, 110 S.Ct. 322, 107 L.Ed.2d 312 (1989). We disagree. We hold that Blackman's use of an alias qualified him for an increase under Guideline § 3C1.1 regardless of whether the authorities were actually foiled by his false identification. As we noted in *United States v. Patterson,* 890 F.2d 69, 72 (8th Cir.1989) (*Patterson*), Guideline § 3C1.1 specifically encompasses an *attempt* to impede or obstruct justice. Therefore no finding of actual prejudice to the government is required. *Patterson,* 890 F.2d at 72; *accord United States v. Irabor,* 894 F.2d 554, 556 (2d Cir.1990); *United States v. Baker,* 894 F.2d 1083, 1084 (9th Cir.1990).

■■■ As to whether Blackman was entitled to an evidentiary hearing on his intent, or lack thereof, to obstruct justice by using an alias, we note that defense counsel did not object at the sentencing hearing to any factual findings relevant to the two-level increase under Guideline § 3C1.1. Therefore, Blackman waived his right to challenge the accuracy or evidentiary basis for those findings on appeal. Furthermore, Blackman's intent could be inferred from his repeated use of several aliases and therefore no evidentiary hearing was required. *Cf. Patterson,* 890 F.2d at 73.

## VI. Ineffective Assistance of Counsel

■■■ Finally, Blackman argues he was deprived of his constitutional right to effective counsel. Because the issue was not raised below, we have no record upon

11. Blackman's reliance on the language in the Application Notes to Guideline § 3C1.1 referring to "material falsehoods" is misplaced. Materiality is distinct from actual prejudice to the government. A false statement is material if it is capable of influencing the investigation or prosecution of the offense. *Cf. United States v. Richmond,* 700 F.2d 1183, 1188 (8th Cir.1983) (materiality of a false statement for purposes of 18 U.S.C. § 1001 does not require a showing that the agency actually relied on the statement or suffered pecuniary loss and is present if the statement was capable of influencing the agency's decision). Clearly the identification of the defendant is a material fact. Actual prejudice, on the other hand, refers to whether or not the government was actually misled by the false statement, *i.e.,* whether the authorities knew the statement to be false.

which to review Blackman's claims. We therefore decline to address the issue on this appeal. *See United States v. Gallegos–Torres,* 841 F.2d 240, 242–43 (8th Cir. 1988); *United States v. Dubray,* 727 F.2d 771, 772 (8th Cir.1984) (per curiam). The proper procedure for challenging the effectiveness of trial counsel is a petition for post-conviction relief pursuant to 28 U.S.C. § 2255.

HEANEY, Senior Circuit Judge, dissenting.

I respectfully dissent. Blackman gave the police a false name when arrested. The authorities knew Blackman's identity and the various aliases he used at the time of his arrest. The majority today holds that Blackman's use of an alias at the time of his arrest, conduct which had no material effect on any investigation or proceeding, *mandates* the enhancement of Blackman's offense level by two levels, or an increase in sentence of more than five years if Blackman were sentenced at midrange. This holding interprets section 3C1.1 too broadly, undermines the guidelines' goal of proportionality in sentencing, and unjustifiably increases Blackman's sentence.

The criminal offense of obstruction of justice traditionally applied only to post-offense conduct occurring during the pendency of formal judicial proceedings. *See, e.g., Ferina v. United States,* 302 F.2d 95, 102 (8th Cir.), *cert. denied,* 371 U.S. 819, 83 S.Ct. 35, 9 L.Ed.2d 59 (1962). Although this court has noted that the Sentencing Commission intended section 3C1.1 also to encompass obstructive acts committed during the investigation of an offense, *United States v. Werlinger,* 894 F.2d 1015, 1016 (8th Cir.1990), the commentary to section 3C1.1 provides examples of conduct meriting the obstruction adjustment which primarily retain the traditional focus on post-offense activity calculated to obstruct judicial proceedings, *see* U.S.S.G. § 3C1.1 commentary, application note 1(a)–(e).[1] While the list is not exclusive, the examples provided indicate that the Sentencing Commission intended to punish only *material* falsehoods.[2] Moreover, the examples given are sufficiently specific to suggest that the Commission considered a variety of obstructive acts occurring in actual prosecutions while compiling the list. I find it hard to believe that the Commission intended to include but failed to mention the use of an alias on arrest, a deception that likely occurs more frequently than do the listed examples. The majority's extension of section 3C1.1 to encompass Blackman's futile attempt to conceal his identity to avoid apprehension during the commission of a crime stretches the meaning of the phrase "willfully obstructing or impeding proceedings" beyond its reasonable limits.

The commentary to section 3C1.1 provides further support for the notion that the Sentencing Commission intended the obstruction adjustment to apply primarily to acts calculated to interfere with judicial proceedings. Application note 4 states that where the defendant is convicted of an offense covered by the guidelines pertaining to contempt, obstruction of justice, perjury, bribery of witness, or payment to witness, the adjustment in section 3C1.1 is not to be applied. U.S.S.G. § 3C1.1 com-

---

1. Application note 1 states:
   1. The following conduct, while not exclusive, may provide a basis for applying this adjustment:
   (a) destroying or concealing *material* evidence, or attempting to do so;
   (b) directing or procuring another person to destroy or conceal *material* evidence, or attempting to do so;
   (c) testifying untruthfully or suborning untruthful testimony concerning a *material* fact, or producing or attempting to produce an altered, forged, or counterfeit document or record during a preliminary or grand jury proceeding, trial, sentencing proceeding, or any other judicial proceeding;

   (d) threatening, intimidating, or otherwise unlawfully attempting to influence a codefendant, witness, or juror, directly or indirectly;
   (e) furnishing *material* falsehoods to a probation officer in the course of a presentence or other investigation for the court.
   U.S.S.G. § 3C1.1 commentary, application note 1 (emphasis added).

2. The majority notes that the identification of the defendant is clearly a material fact. When the authorities know a suspect's identity and all his aliases before arresting him, however, any attempt by the suspect to conceal that identity is immaterial for purposes of obstructing or impeding the proceedings against him.

mentary, application note 4. The Commission thus sought to avoid double-counting conduct obstructive of judicial proceedings in applying the obstruction adjustment.

The majority notes that section 3C1.1, interpreted broadly, encompasses wholly ineffectual attempts to obstruct justice. This expansive reading, however, conflicts with the basic tenet of statutory interpretation requiring courts to construe penal statutes narrowly. *See Dowling v. United States,* 473 U.S. 207, 215–16, 105 S.Ct. 3127, 3132, 87 L.Ed.2d 152, 159 (1985); *Williams v. United States,* 458 U.S. 279, 290, 102 S.Ct. 3088, 3094, 73 L.Ed.2d 767 (1982). Additionally, the majority's reasoning ignores the principle of proportionality and section 3C1.1's necessary concern with the potential for harm created by a defendant's obstruction of justice. *See generally* U.S.S.G. ch. 1, pt. A, policy statement (The Basic Approach); *cf. United States v. Baker,* 894 F.2d 1083, 1084 (9th Cir.1990) (defendant's lies to probation officer had potential for obstructing justice and were therefore material under section 3C1.1 although court eventually discovered true extent of defendant's criminal record). The majority treats Blackman in the same manner as it would a defendant who threatens injury to a witness. This result is contrary to the purposes of the guidelines and lacks penological justification.

The majority approves an increase in Blackman's offense level equivalent to those received in *United States v. Patterson,* 890 F.2d 69 (8th Cir.1989), and *United States v. Brett,* 872 F.2d 1365 (8th Cir. 1989). In *Patterson* and *Brett,* the defendants' obstructive efforts had both greater potential for harm to the administration of justice and greater actual obstructive effect than did Blackman's. I would have dissented from the results in *Patterson* and *Brett* had I been on those panels, because I believe that the conduct of the defendants in those cases, albeit more egregious than Blackman's, did not merit a possible increase in their sentences of twenty-five percent. A comparison of the facts of those cases with Blackman's conduct nonetheless illustrates the disparity in sentencing that the majority's holding promotes.

In *Patterson,* the defendant gave a false name on arrest and at a post-arrest FBI interview. 890 F.2d at 70–71. He also gave the FBI agent a false date and place of birth and refused to give his name to the magistrate. *Id.* at 71. The FBI had to obtain the defendant's motel phone records and perform a fingerprint comparison before confirming the defendant's actual identity. *Id.* In *Brett,* the defendant gave a false name on arrest and did not admit his true identity to authorities until twenty-six days later. 872 F.2d at 1368. The district court found that Brett's delay in correctly identifying himself cost the government time, manpower, and money. *Id.* at 1372–73. Thus, each of these defendants' use of a false name, unlike Blackman's, had some potential to actually hinder the administration of justice.

The obstruction adjustment to Blackman's offense level increased his sentencing range from 235–293 months to 292–365 months. In *Brett* and *Patterson,* the defendants' sentencing ranges increased from 97–121 months to 121–151 months and from 46–57 months to 57–71 months, respectively. Blackman's futile attempt to conceal his identity thus earned him a twenty-four percent increase in his sentencing range, while the defendants in *Brett* and *Patterson* received twenty-three and twenty-five percent increases. Because of Blackman's higher base offense level, his increase amounts to substantially more real time than was received in *Brett* and *Patterson,* cases in which the defendants' attempted obstruction actually hindered their prosecution.

Although such disparities are to some extent inevitable under the guidelines, extending section 3C1.1 to conduct as innocuous as Blackman's futile attempt to avoid apprehension increases the risk that the obstruction adjustment will be used to punish widely varying levels of evasive conduct with sentences of undifferentiated severity. Moreover, by applying section 3C1.1 to conduct engaged in during the commission of a crime to avoid apprehension, the majority creates the possibility that any affirmative step taken by a defendant to avoid detection could qualify for a two-level increase for obstruction of justice. Thus, conduct such as concealing one's identity from

one's victim during the commission of a crime or fleeing the scene of the crime arguably could merit the same two-level adjustment as committing perjury or threatening a witness, because all such acts ultimately are "calculated to mislead or deceive authorities." *See* U.S.S.G. § 3C1.1 commentary.

I do not believe Congress or the Sentencing Commission intended section 3C1.1 to sweep so broadly or to promote such inconsistency. A five-year adjustment to Blackman's sentence constitutes five years of real time under the guidelines and is the equivalent of a twelve-year pre-guidelines sentence. One of the Sentencing Commission's goals in establishing the guideline ranges was to approximate the average sentences being served for various categories of offenses under pre-guidelines practice. U.S.S.G. ch. 1, pt. A, policy statement (The Guidelines' Resolution of Major Issues). I question whether the Commission heard evidence that pre-guidelines courts were imposing five-year real time sentences for the use of aliases on arrest. I would vacate Blackman's sentence and remand the case for resentencing at a base offense level of 36, Blackman's sentencing level without the enhancement for obstruction of justice.