25 F.3d 1051
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
 UNITED STATES of America, Plaintiff-Appellee,
v.
Roberto ROPER, Defendant-Appellant.
 No. 93-3592.
 United States Court of Appeals, Sixth Circuit.
 June 7, 1994.
 
 Before: NELSON and SILER, Circuit Judges; and HACKETT, District Judge.*
 PER CURIAM.
 
 
 1
 Roberto Roper appeals his conviction on charges of conspiracy to distribute cocaine, making a false statement to obtain a firearm, possession of a firearm as a convicted felon, and money laundering. Roper also appeals the trial court's sentence and imposition of a fine.
 
 
 2
 * On March 5, 1992, members of the Mahoning County Drug Task Force searched the residence of Roberto Roper and Rose Marie Caradine in Youngstown, Ohio. Officers seized a 9mm Beretta and clip, $1,100 in cash, and $30,404 in cash in 3 Crown Royal bags which were stuffed in a woman's handbag found behind the television set in the living room. They also seized records and documents showing large expenditures of money at Leroy Jewelers and Great Garage Doors, the transfer of money by Western Union, and telephone bills. Officers also found a Nissan Pathfinder truck and a condom filled with cocaine in the garage. Rose Marie Caradine was present in the home at the time it was searched.
 
 
 3
 To prove its charge of conspiracy to distribute cocaine against the co-defendant Roberto Roper, the government called and examined Sally Rivera, Ramona Mercado, and Kay Seneca as witnesses. Ramona Mercado testified that she met Roper in New York City when she was 13 and began dating him when she was 17 years of age.
 
 
 4
 In the early part of 1989, Mercado, at Roper's instruction, took 8 ounces of cocaine from New York to Youngstown to sell. She returned the profits to Roper in New York. In 1989, Mercado and Roper moved to Youngstown and began to sell cocaine in the area. Roper purchased a house and put it in Mercado's name. Mercado testified that by 1990, Roper was dealing in kilogram quantities of cocaine for which he paid about $26,000, selling 1 to 2 kilograms per month. Roper regularly collected his money from the sale of the cocaine on Friday and paid his "workers" on Sunday. At some point in 1991, Roper moved out of Mercado's home and into Caradine's home.
 
 
 5
 In early 1992, Mercado moved out of the residence she had shared with Roper and moved into a home on another street. Before she left, Mercado took photographs of cocaine and a gun which were in their home and identified the cocaine and gun as Roper's. She testified to having stored up to $35,000 cash at a time for Roper in her home.
 
 
 6
 Mercado also testified that she had seen Cardine with a large amount of cash on 3 separate occasions. One of those occasions was when she and Caradine were going to federal court. Caradine showed Mercado a large sum of cash and stated that she did not want to put her bag through the "machine," the detection device at the door of the courthouse.
 
 
 7
 Mercado admitted that she bore a grudge against Roper because he had denied the paternity of their last child, that she had used cocaine, and that she had written a letter to Roper saying she would "get him." She said that Roper had worked at the East Side Civics Club during the period in question, but only for approximately 3 months.
 
 
 8
 The government also called Sally Rivera as a witness. Rivera testified that her home had been searched by local police on August 2, 1991, and that the police had found her triple beam scale, her pocket scale, her address book, and 10 ounces of cocaine. She stated that she had received the 10 ounces of cocaine from her supplier, Roberto Roper. Rivera stated that she had started dealing in cocaine with Roper in the winter of 1991. She received 1/2 to 1 ounce quantities from him at first, then moved up to 2 to 3 ounces per week. Her sales increased and she received 5 ounces, then 10 ounces per week from Roper. She testified that during the summer of 1991, she and Roper had "broken down" at least 3 kilograms of cocaine at various locations around Youngstown. Rivera admitted that she had been granted leniency as to the county charges pending against her by agreeing to testify against Roper.
 
 
 9
 Kay Seneca told the jury that she had been arrested on a charge of possession of cocaine and then began to cooperate with the police. During the course of her cooperation in making a case against Seneca's source of supply, Seneca met Roberto Roper. She agreed to assist the Federal Bureau of Investigation in making a case against Roper in exchange for $5,000 in relocation money.
 
 
 10
 Seneca met Roper in early October, 1991, at Debbie Mitchum's house in Youngstown. Seneca recorded many of her telephone and in-person conversations with Roper. These recordings were played to the jury. Two of the conversations that were not recorded were recounted by Seneca from the witness stand. Seneca testified that on November 2, 1991, she received a page from Roper who said he wanted to "do business." At Roper's direction, she went to an apartment and was met by Roper, Jeanette Gooden, a woman named Tracy from New Jersey, and an older woman. She was quizzed on her knowledge of the cocaine trade and then left.
 
 
 11
 Approximately five days later, Gooden paged Seneca and requested that she return to the same apartment. When Seneca arrived, she saw Roper cutting up 4 or 5 kilograms of cocaine. Roper was using a large digital scale, cutting the cocaine into smaller quantities and then weighing it. She was put into a bedroom with Gooden's daughter and could hear the comings and goings of people through the living room area. When she was allowed out of the bedroom, she saw Roper splitting up the last kilogram of cocaine.
 
 
 12
 The government presented evidence of two transactions in which vehicles were purchased using straw purchasers to prove that Roper and Caradine had engaged in money laundering. Caradine and Roper were convicted on Count 7 of the indictment, based on the purchase of a Nissan Maxima.
 
 
 13
 In November, 1990, Roper supplied the cash to purchase a 1990 Nissan Maxima, titled in Caradine's name. Caradine's grandfather Ladell Turner testified that he was asked by either Caradine or Roper to take the two out to Greenwood Nissan, a car dealership. After an initial discussion at the dealership, there was a disagreement about something and Roper asked for his down payment back and they went outside. After a short time, all three went back into the dealership and the deal was completed. Either Roper or Caradine handed Turner $14,000 in cash. Again, he could not recall which of the two did this. He gave the money to the cashiers at the dealership. Caradine paid Turner approximately $50 for his services.
 
 
 14
 After the purchase, Turner was approached by federal agents and asked if he had given Caradine the money for the car. Although at first Turner told the agents that he had used money from his savings, he later told the agents the money had come from Caradine or Roper.
 
 
 15
 The salesman for the Maxima was Charles Partee. Partee told the jury that on November 6, 1990, Alonzo Dilligard (a/k/a Roper) came into the Nissan dealership and picked out a Maxima to purchase for his girlfriend. He paid $7,000 cash as a down payment on the car.
 
 
 16
 Partee further testified that on November 12, 1990, Dilligard returned to the dealership, accompanied by a woman and an older man. After a disagreement, the car was purchased for $22,000. That included the $7,000 cash down payment, $1,000 for trade-in on another car, and another $14,000 in cash. Partee identified two receipts for the car. The first one was made out to Alonzo Dilligard and the second was made out to Ladell Turner.
 
 
 17
 Roper alone was convicted on Count 6 of the indictment, a transaction involving the purchase of a Nissan Pathfinder at the same dealership in January, 1992. At trial, the salesman Clarence Allison testified that the first order form was made out to Michelle McGee as the purchaser, and that a $3,500 cash down payment was made. Allison identified Roper as the man who accompanied McGee to the dealership and picked out the truck. Three days later, a further payment of $5,500 in cash was made, the truck was picked up, but was titled to a Roslyn Brown.
 
 
 18
 Roslyn Brown testified that Rose Marie Caradine phoned and asked her to purchase the Pathfinder for Roper because she had a good credit rating and because Roper was having difficulty with credit. A few days after the first conversation regarding the purchase, Caradine called back and asked Brown if she would assist Roper in obtaining the truck. Brown agreed.
 
 
 19
 After Roper picked Brown up to take her to the dealership to purchase the truck, Roper received a call from Caradine on the car phone which was installed in the Maxima. Brown spoke to Caradine and then to a woman at an insurance company. Brown and Roper then went to the insurance company before going to the dealership to pick up the truck. At the dealership, Brown signed all the necessary papers while Roper paid the salesman more cash. Roper drove the Pathfinder home and Brown drove the Maxima. Brown gave the payment book to Caradine.
 
 
 20
 Brown told the jury that she was later interviewed by federal agents. She initially told the agents that the money used to purchase the truck was hers. Later in the interview she told them what had actually happened.
 
 
 21
 On the day the search warrant was executed by the Mahoning County Drug Task Force, Caradine was present in the home she and Roper shared. She was interviewed by Special Agents Patricia Reese and Denise Dolesh of the Internal Revenue Service. Caradine told the agents that the Maxima was purchased by her and her grandfather using social security money and money he had saved. She stated that she received $430 per month in welfare payments. She also told the agents that the Pathfinder belonged to Roslyn Brown, and that Brown had brought over the coupon payment book. Caradine did not explain why the payment book was at her home. Caradine also denied she had a safe deposit box, but later said that the $5,000 in a safe deposit box had come from a bag under the dresser.
 
 
 22
 Donald Muzenic testified for the government as to the charges that Roper possessed a firearm while a convicted felon and made a false statement on Department of Treasury Form 4473, the form federally licensed dealers and purchasers are required to fill out before a firearm is sold. Muzenic testified that he was a federally licensed firearm dealer and a partner in The Shooting Gallery. On August 6, 1990, Muzenic sold a 9mm Beretta to Alonzo Dilligard. Muzenic testified that he was present when Dilligard filled out the form and answered "no" to the questions, "Have you ever been convicted of a crime?" and "Are you an alien illegally in the United States?"
 
 
 23
 Steve Jones, Special Agent with the Immigration and Naturalization Service (INS), testified that INS records indicated that Roper had entered the United States in 1978 as a tourist and had overstayed his visa. Furthermore, Roper stipulated that he had been convicted in New York of a crime carrying a penalty of more than one year imprisonment.
 
 
 24
 After a trial commencing on March 18, 1993, the jury found Roper guilty of five of the seven counts against him. On May 18, 1993, Roper appeared in court for sentencing. The court found a base offense level of 34, based upon a finding that 15-50 kilograms of cocaine were distributed throughout the conspiracy. The trial court determined, pursuant to United States Sentencing Commission, Guidelines Manual, (U.S.S.G.) Sec. 3B1.1(a), that Roper was an organizer or leader of the criminal activity of 5 or more people. The court also found, pursuant to U.S.S.G. Sec. 2D1.1(b)(1), that Roper possessed a firearm during the course of a drug trafficking offense. Based upon an adjusted base offense level of 40, the court imposed a term of incarceration of 260 months, together with a 5-year term of supervised release, a fine of $10,000 and special assessments in the amount of $300.
 
 II
 
 25
 1. Base Offense Level.
 
 
 26
 Roper appeals the trial court's determination that the base offense level offense was 34. In arriving at the base level, the court found that the defendant was responsible for the distribution of between 15 and 50 kilograms of cocaine during the course of the conspiracy. Roper contends that the trial testimony does not support such a finding, arguing that witness testimony regarding quantities of drugs was vague and duplicative.
 
 
 27
 The court applies a clearly erroneous standard of review to the district court's factual findings. United States v. Watkins, 994 F.2d 1192, 1195 (6th Cir.1993); United States v. Sivils, 960 F.2d 587, 596 (6th Cir.), cert. denied, 113 S.Ct. 130, 121 L.Ed.2d 84 (1992). All findings of fact that are crucial to a determination of a defendant's base offense level and criminal history category must be based on proof by a preponderance of the evidence. Watkins, 994 F.2d at 1195; United States v. Jackson, 990 F.2d 251, 254 (6th Cir.1993). The district court relied on its recollection of the testimony of several witnesses relative to amounts of cocaine in this five day trial. The factual finding of the court as to the quantity of drugs is supported by a preponderance of the evidence on the record and is not clearly erroneous.
 
 
 28
 2. Specific Offense Characteristic.
 
 
 29
 Roper next argues that the trial court erred in finding the specific offense characteristic calling for an enhancement in the base offense level based on a finding that the offender used or possessed a firearm during the course of a drug trafficking offense. He contends that because the firearm was not near his person when his home was searched, it is not attributable to him. The 9mm Beretta semi-automatic pistol was located in defendant Caradine's and Roper's home on the day of the search. Roper was found guilty of making a false statement to acquire a firearm and conspiracy to distribute cocaine. These convictions support the court's finding that the defendant possessed a firearm during the course of a drug trafficking offense; the finding is not clearly erroneous. Moreover, even though the jury acquitted Roper of Count 5 of the indictment, using or carrying a firearm during and in relation to a drug trafficking crime, the court's finding was not clearly erroneous in light of the evidence in the record. See United States v. August, 984 F.2d 705, 713 (6th Cir.1992) (per curiam), cert. denied, 114 S.Ct. 158, 126 L.Ed.2d 119 (1993) (Acquitted conduct may be used in imposing sentence) (citing United States v. Moreno, 933 F.2d 362, 374 (6th Cir.) cert. denied, 112 S.Ct. 265, 116 L.Ed.2d 218 (1991)).
 
 
 30
 3. Leadership Role.
 
 
 31
 The district court also enhanced Roper's base offense level by four levels after finding that the defendant was an organizer or leader of a criminal activity that involved five or more participants. See U.S.S.G. Sec. 3B1.1. Defendant argues that the trial court failed to account for the fact that several of the persons with whom Roper was associated were government informants.
 
 
 32
 This factual finding is also reviewed under the clearly-erroneous standard. United States v. Okayfor, 996 F.2d 116, 122 (6th Cir.) cert. denied, 114 S.Ct. 238, 126 L.Ed.2d 192 (1993). The trial court found that the testimony regarding persons Roper involved in the drug conspiracy justified its finding. The individuals in this case were informants, not government agents. "The district court was not required to cite specific facts to support its findings ... because it presided over the trial." Id. (citing United States v. Richardson, 949 F.2d 851, 859 (6th Cir.1991)). Based on the trial record, this finding is not clearly erroneous.
 
 III
 
 33
 Defendant appeals the district court's imposition of a $10,000 fine. Under 18 U.S.C. Sec. 3572 and U.S.S.G. Sec. 5E1.2(d)(2) the sentencing court must consider the defendant's ability to pay before assessing a fine. United States v. Hopper, 941 F.2d 419, 423 (6th Cir.1991). Roper argues that he clearly showed an inability to pay the fine imposed. He points to the finding that he was indigent for the purpose of appointing counsel, as well as his duty to support his children, as factors which showed his inability to pay. He also contends that the fine should not have been imposed without a specific finding on the record that Roper had the ability to pay.
 
 
 34
 The district court is bound to impose a fine within the Guidelines range "except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine." See U.S.S.G. Secs. 5E1.2(a), (f); United States v. Hickey, 917 F.2d 901, 906 (6th Cir.1990). "[T]he defendant has the burden of establishing that he or she is not able and, even with the use of a reasonable installment schedule, is not likely to become able to pay all or part of the fine." United States v. Tosca, No. 92-4205, 1994 W.L. 85617 at (6th Cir. March 21, 1994) (citing United States v. Perez, 871 F.2d 45, 48 (6th Cir.), cert. denied, 492 U.S. 910 (1989), and United States v. Blanchard, 9 F.3d 22 (6th Cir.1993)).
 
 
 35
 The mere allegation that the trial court did not make specific factual findings on the record does not require a conclusion that the court did not consider the defendant's ability to pay before assessing the fine. Nothing in the record other than broad allegations regarding the defendant's duty to support his children and his indigency for purposes of court appointed counsel suggests that a fine is not appropriate in this case. Defendant has not met his burden to establish an inability to pay under the applicable Guidelines and case law.
 
 
 36
 In this case, the sentencing judge provided in the judgment against Roper that the fine would be remitted if Roper designated at least 80% of his prison income for the support of his family. This indicates that the judge considered the effect of a fine on Roper and his obligation to his dependents. The district court's imposition of the fine was proper.
 
 IV
 
 37
 Next, Roper challenges the trial court's denial of his motion for acquittal, arguing that there was insufficient evidence introduced by the government to establish the defendant's guilt: 1) in the offense of conspiracy to distribute cocaine; 2) in the offense of making a false statement in connection with the acquisition of a firearm; 3) in the offenses of money laundering; and, 4) in the offense of being a felon in possession of a firearm.
 
 
 38
 A review of an appeal based on insufficiency of the evidence requires the court to determine if "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). The evidence must be considered as a whole and viewed in a light most favorable to the government, along with all legitimate inferences that could be drawn from the evidence. United States v. White, 788 F.2d 390, 393 (6th Cir.1986). The evidence need not exclude every logical hypothesis other than guilt. United States v. Green, 548 F.2d 1261, 1266 (6th Cir.1977).
 
 
 39
 1. Drug Conspiracy.
 
 
 40
 Roper argues that the conspiracy count against him rested, in large part, upon the unreliable testimony of witnesses with personal grudges against him. He says that the testimony of witnesses who were drug users and offenders who received "inordinate consideration" from the authorities in exchange for their testimony against him is not sufficient to sustain his conviction.
 
 
 41
 Under the applicable standard of review, a rational trier of fact could find all of the essential elements of a drug conspiracy[2] beyond a reasonable doubt. The credibility of the witnesses was for the jury to consider and this court will not substitute its judgment for that of the jury. United States v. Wynn, 987 F.2d 354, 358 (6th Cir.1993). See also, United States v. Farley, 2 F.3d 645, 652 (6th Cir.) (recognizing that "attacks on witness credibility are simply challenges to the quality of the government's evidence and not to the sufficiency of the evidence") (emphasis in original), cert. denied, 114 S.Ct. 649, 126 L.Ed.2d 607 (1993). The trial court's denial of the defendant's motion for acquittal on the drug conspiracy charge was correct, given that Roper's argument as to the sufficiency of the evidence rests solely on the premise that the government witnesses lacked credibility.
 
 
 42
 2. False Statement to Obtain a Firearm.
 
 
 43
 Count two of the indictment charged Roper with making a false statement in connection with the acquisition of a firearm in violation of 18 U.S.C. Sec. 922(a)(6). Specifically, the government charged that Roper made a false statement on a federal firearm form by failing to inform the federally licensed firearm dealer of his former felony conviction.
 
 
 44
 The government presented the testimony of the owner of the firearm dealership, who testified that he sold a 9mm Beretta to Alonzo Dillegard on August 6, 1990. The purchaser of the weapon filled out the federal ATF Form 4473 by answering "no" to the questions of whether the purchaser was an illegal alien or had ever been convicted of a criminal offense, the punishment for which exceeded one year.
 
 
 45
 Again, Roper's challenge centers on the credibility of the government's witness. The trial court's ruling was proper under the previously discussed standards.
 
 
 46
 3. Money laundering counts.
 
 
 47
 Roper argues that while the government established that the circumstances surrounding the purchases of the two vehicles were unusual, there is insufficient evidence to support an inference that the funds came from a specified unlawful activity and that the transaction was designed to disguise the true nature of the funds. Thus, he contends that the government did not meet its burden of proof as to all of the elements necessary to sustain his money laundering conviction.
 
 
 48
 Under 18 U.S.C. Sec. 1956(a)(1)(B)(i), the federal money laundering statute, the government must prove beyond a reasonable doubt that the defendant: 1) knowingly conducted a financial transaction; 2) was using funds which had come from a specified unlawful activity; 3) knew that the money was from a specified unlawful activity; and, 4) participated in the transaction with the intent to conceal or disguise the nature or source of the funds involved. United States v. Beddow, 957 F.2d 1330, 1334 (6th Cir.1992) (citing United States v. Blackman, 904 F.2d 1250, 1256 (8th Cir.1990)). See also, United States v. McDougald, 990 F.2d 259 (6th Cir.1993).
 
 
 49
 There is ample evidence in the record to support Roper's conviction on both of the money laundering counts. The jury was free to make all reasonable inferences from the evidence presented. A rational juror could find that the government had proven each of the four elements beyond a reasonable doubt. Jackson, supra; and United States v. Ellzey, 874 F.2d 324, 328 (6th Cir.1989) ("circumstantial evidence alone is sufficient to sustain a conviction and such evidence need not 'remove every reasonable hypothesis except that of guilt.' ") (quoting United States v. Stone, 748 F.2d 361, 363 (6th Cir.1984).
 
 
 50
 4. Felon in possession.
 
 
 51
 Roper argues that the trial court erred in denying his motion for judgment of acquittal, arguing that the government presented insufficient evidence to establish the defendant's guilt of the offense of being a convicted felon in possession of a firearm. Count three of the indictment charged that Roper being a convicted felon possessed a 9mm Beretta pistol in violation of 18 U.S.C. Sec. 922(g)(1).
 
 
 52
 The government must prove three essential elements in order to sustain a conviction under Sec. 922(g)(1): 1) the defendant has been convicted in any court of a crime punishable by imprisonment for a term exceeding one year; 2) the defendant knowingly possessed a firearm; and, 3) the possession was in or affected interstate commerce.
 
 
 53
 Roper contends that the evidence was insufficient because Donald Muzenic, the owner of the firearms store where Roper purchased the pistol, acknowledged that the purchaser of the pistol spoke very broken English, making the identification of the purchaser by the store owner suspect. Nevertheless, Muzenic's credibility in identifying Roper as the purchaser of the firearm was within the province of the jury. Thus, this argument fails.
 
 
 54
 Roper also states that the government was unable to present sufficient evidence that he was in possession of the Beretta semi-automatic pistol. Both actual and constructive possession satisfy the possession element for purposes of 18 U.S.C. Sec. 922(g). Actual possession occurs when a party has immediate possession or control over the firearm. Constructive possession exists when the party "knowingly has the power and the intention at a given time to exercise dominion and control over an object, either directly or through others." United States v. Craven, 478 F.2d 1329, 1333 (6th Cir.), cert. denied 414 U.S. 866 (1973). Direct or circumstantial evidence may be used to prove both actual and constructive possession. United States v. Morgan, 469 F.2d 83 (6th Cir.1972).
 
 
 55
 There is evidence that Roper had actual and constructive possession of the firearm sufficient to sustain the jury's verdict. The jury could find Roper guilty of actual possession on August 6, 1990, when he purchased the firearm. Guilt of constructive possession is supported by the firearm being found in co-defendant Caradine's purse in their joint residence, creating a substantial link to Roper. A reasonable jury could find Roper guilty beyond a reasonable doubt of a Sec. 922(g) violation. The trial court did not err in denying defendant's motion for acquittal on this count.
 
 V
 
 56
 For the reasons stated above, we AFFIRM defendant Roberto Roper's conviction, sentence, and fine.
 
 
 
 *
 The Honorable Barbara K. Hackett, United States District Judge for the Eastern District of Michigan, sitting by designation
 
 
 [2]
 The elements the government msut prove under 21 U.S.C. Sec. 846 are: (1) that an agreement to violate the drug laws existed; and (2) that each conspirator knew of, intended to join, and participated in the conspiracy. United States v. Phibbs, 999 F.2d 1053, 1063 (6th Cir.1993) (quoting United States v. Pierce, 912 F.2d 159, 161 (6th Cir.1990)), cert. denied, 114 S.Ct. 1070, 1071 (1994). Proof of the elements may be by direct or circumstantial evidence. United States v. Meyers, 646 F.2d 1142, 143-44 (6th Cir.1981) (citing United States v. Luxenberg, 374 F.2d 241, 250 (6th Cir.1967))