UNITED STATES of America,
Plaintiff–Appellee,

v.

Samy A. MANKARIOUS and Thomas K.
Murphy, Defendants–Appellants.

Nos. 97–3028, 97–3029.

United States Court of Appeals,
Seventh Circuit.

Argued May 18, 1998.

Decided Aug. 7, 1998.

Joseph R. Wall (argued), Thomas P. Schneider, Office of the United States Attorney, Milwaukee, WI, for Plaintiff–Appellee in No.97–3028.

Francis D. Schmitz (argued), Thomas P. Schneider, Office of the United States Attorney, Milwaukee, WI, for Plaintiff–Appellee in No.97–3029.

Thomas E. Brown (argued), Kathryn A. Keppel, Gimbel, Reilly, Guerin & Brown, Milwaukee, WI, for Defendant–Appellant Samy A. Mankarious.

Terry E. Mitchell (argued), Hartland, WI, for Defendant–Appellant Thomas K. Murphy.

Before CUMMINGS, ROVNER, and EVANS, Circuit Judges.

TERENCE T. EVANS, Circuit Judge.

In this case, Samy Mankarious and Thomas Murphy offer more than a dozen reasons for reversing their convictions for money laundering, wire fraud, and filing false tax returns. They do not skimp on the sentencing issues, either, arguing at least 11 grounds for recalculating their offense levels under the federal sentencing guidelines. Before considering this veritable plethora of issues, we set out the facts, which of course are viewed in the light most favorable to the jury's verdict.

In 1989 Mankarious and Murphy launched Delta Group, Inc., an aluminum smelting company based in Muskego, Wisconsin. Over the next several years, the two used Delta as the springboard for a variety of fraudulent schemes. At first it may sound like Mankarious and Murphy stole just from themselves, but that is not true. While the two men owned 59 percent of Delta, the remaining 41 percent belonged to WITECH, a venture capital operation run by Wisconsin Energy Corp., Wisconsin's largest utility. WITECH contributed $175,000 toward the construction of Delta's plant and, through an investment agreement, WITECH exercised significant control over fundamental business decisions at Delta. For instance, the utility closely controlled the salaries, profit shares, and benefits given to Mankarious and Murphy. Apparently the two men resented what they perceived to be low salaries. By 1992 they convinced WITECH to pay them a bonus and to lower the interest rate on a company loan. Seemingly, these concessions did not satisfy Mankarious and Murphy. The government suggests that their frustration served as a motive for their crimes. Perhaps yes, perhaps no. At any rate, we now get to the fraudulent activity that led to the indictment which led to the convictions of Murphy and Mankarious.

The first of the fraud schemes involved Ed Brown and the company he partially owned, UPEC & Associates. Brown testified for the government and provided many of the details of the following story. UPEC began its relationship with Delta in 1990 when it bid on and eventually built Delta's furnace. In the following years, Delta regularly hired UPEC. As the relationship between the two companies grew, so did the relationship between Mankarious, Murphy, and Brown. During the summer of 1990 Brown asked Mankarious and Murphy if they knew of any methods to withdraw money from a company. Murphy replied, "There's lots of ways. Stick around with us and we'll show you the reins." Mankarious then outlined a plan for Brown to bilk money out of Delta—of course, Brown would share a cut with the men from Delta.

Under this scheme UPEC performed work at Delta, with Brown submitting false invoices for each job. Mankarious and Murphy would cut checks to cover these invoices, sometimes making the checks out to a fictitious payee. Brown would endorse the

checks and return them to Mankarious, who would cash them at a tavern called the Brat N Beer. At first Brown received half the proceeds, with Mankarious and Murphy splitting the other half. Later Mankarious convinced Brown to split the take evenly among the three men.

In the winter of 1990 the details of the scheme changed slightly. UPEC continued to perform work at Delta, but Brown began sending invoices to Delta from his father-in-law's Topper Manufacturing. Over the next several months Mankarious and Murphy cut eight checks to Topper totaling over $28,000. On many occasions Mankarious and Murphy co-signed the checks in front of Brown at Delta. At least once, however, Mankarious apparently took care of business alone, telling Brown not to inform Murphy. And from early 1991 until early 1992, without Brown's knowledge, Mankarious and Murphy signed five checks from Delta to Topper totaling over $23,000. Mankarious cashed these checks at the tavern. (These betrayals recall yet again that there is no honor among thieves.)

Mankarious cashed the checks at the Brat N Beer because of his close relationship with the owner, Ralph Adamczyk. Mankarious' checks were the largest that Adamczyk cashed, and Mankarious often would call just before bank closing time to make sure that Adamczyk had enough cash on hand. If the tavern owner was short, Mankarious would drive him to the bank to pick up enough cash to cover a given check. Both Adamczyk and Diana Coffey, a bartender at the Brat N Beer, testified that they never saw Ed Brown.

In mid–1991, UPEC & Associates dissolved and Brown took over a new company, UPEC, as the sole owner. The schemers concocted a new variation on their scam. Brown would inflate UPEC's invoices to Delta and then write Mankarious a kickback check. Apparently Mankarious shared this perk with Murphy. For instance, in one transaction UPEC overbilled Delta by $6,850. Delta paid the bill and Brown cut a $6,850 check to Delta. Mankarious objected and asked Brown to make the check out to one of UPEC's larger suppliers. Brown then wrote out a $6,850 check to I. Bahcall and gave it to Mankarious. On another occasion, UPEC submitted a bogus invoice for $21,500 after Mankarious demanded about that much from UPEC's comptroller, Tom Hansen. Brown told Hansen to do whatever Mankarious asked. Delta paid UPEC the $21,500 and Brown wrote a check for $10,500 to Sam's Trading (a fireworks business run by Mankarious) and another $10,500 check to Seasonal Merchandise (a fireworks business run by Murphy). UPEC seems to have submitted another bogus invoice for $26,000 paid to the two fireworks companies. Notably, throughout all these schemes Delta never took the early payment discount allowed by UPEC's invoices.

Sometimes UPEC would even bill Delta for work performed at either Mankarious' or Murphy's homes or for their businesses. For instance, Mankarious received a deck around his pool, a bay window, a paint job for his house, trailer hitches for his cars, kitchen cabinets and kitchen remodeling, roof repairs, and dollies for gun safes. Murphy received dollies and trailer hitches. Adding insult to injury, UPEC not only billed Delta for these projects but inflated the invoices as well. Thus Mankarious and Murphy reaped double benefits—the free work plus the kickback. On another occasion, UPEC paid Dave Kerr to install a furnace and an air conditioner at Murphy's house. UPEC then invoiced Delta for the bill. Following this tiny subplot, Mankarious and Murphy telephoned Hansen (UPEC's comptroller) and told him to destroy the paper trail because Murphy was nervous. Apparently not too nervous, though—2 months later Murphy told Kerr to install an air conditioner at his parent's home. Again, Kerr billed UPEC and UPEC billed Delta.

During the summer of 1992 Mankarious and Murphy met with Brown to cook up a plan to overbill Delta by $50,000. Brown sent the invoice, received payment, and made out the kickback check to Mankarious' brother-in-law. A few months later, however, Mankarious telephoned and explained that the IRS was snooping around. He returned the money and told Brown to use it as prepayment on future bills to Delta.

Throughout the UPEC invoice scheme Brown would hand-carry the questionable invoices to Delta. Delta would cut the checks while Brown waited. According to Mankarious and Murphy, UPEC would not send duplicate invoices in the mail. According to the government, UPEC routinely sent copies through the mail.

In addition to concocting the UPEC/Brown scheme, Mankarious and Murphy also fell in with Roger Green, who ran Metal Brokers International ("MBI") out of Cape Coral, Florida. MBI ran a complex fraudulent operation through which it bought aluminum ingot from various smelters under the pretense that either GE or Emerson Electric would purchase the metal. In reality, MBI sold the metal to other buyers but used a system of cleverly named bank accounts to make it appear that the big companies paid the bill. According to the government, Green ran a Ponzi scheme, making increasingly late payments for the aluminum. *See Scholes v. Lehmann*, 56 F.3d 750 (7th Cir. 1995). Once the government caught up with Green, he testified against Mankarious and Murphy.

Delta began to sell metal through MBI innocently, but several late payments tipped off Mankarious, who began to investigate. He discovered that MBI was up to something and called Green. Green offered to pay him off, but Mankarious suggested that they should pursue "business opportunities" together. Green flew to Milwaukee, where he and Mankarious developed a plan. Under one part of the plan Delta received aluminum ingot through MBI at scrap prices and Green received money that he needed to keep his scam running. A Delta employee testified to the activity on Delta's loading dock—ingot arriving from Delta's competitor Met–Al (a victim of MBI), ingot piling up, ingot arriving on one truck and leaving minutes later on another.

In another part of the plan—here's where it gets really complicated—Delta shipped aluminum to MBI but billed Emerson. A cohort of Green's at Emerson intercepted the bills and sent them to MBI. Mankarious used the accounts receivable from Emerson to prop up Delta's line of credit at his bank.

Delta used this line of credit to make payments to MBI for the cheap aluminum it received and to pay commissions to Green. Mankarious and Murphy paid Green an inflated commission on the shipments, and Green returned the favor by paying a $30,000 kickback to Sam's Trading (Mankarious' fireworks company). Meanwhile, Green used the money from the cheap aluminum to pay Delta for the aluminum allegedly headed to Emerson. At some point, Green created Gamma Metals to aid this plan. To make matters even more confusing, this plan is referred to variously as the "dash invoice" plan, the "drop shipment" plan, or the "accounts receivable" plan. Some of the payments involved in this scheme entailed wire transfers from an account with a name intended to mimic an Emerson account. The paperwork on this scheme included invoices to Gamma from the two fireworks companies. For instance, in June of 1992 MBI sent Murphy a $7,900 check for Seasonal Merchandise and wired Mankarious a $33,400 payment for Sam's Trading. At the same time, Murphy signed a $986,600 check from Delta to MBI as payment on the dash invoices.

The operation was working so well that Mankarious and Murphy convinced Murphy's girl friend—Julie Witte—to create Parkfield, a warehousing business that would work with Green. Parkfield and Gamma swapped invoices and payments. Gamma sent at least one check to Parkfield care of Murphy. Witte testified that in running Parkfield she did whatever Murphy told her to do.

Unfortunately for the defendants, the government discovered Green's criminal activity in late 1992. After the government exposed Green's schemes, Mankarious and Murphy tried to cover their tracks. For instance, Green executed a security agreement, transferring cash and accounts receivable to Delta. Mankarious and Murphy assured Green that they would purge Delta's records to thwart the FBI investigation. At the same time, Mankarious returned the $50,000 to Brown and also asked him to hold a bag of $60,000 in cash because he feared an FBI search of his house. In 1993 Mankarious and Murphy met with Brown to discuss how to deal with any audits or investigations—they agreed to

characterize the flow of money from UPEC to the fireworks companies as loans. Murphy gave Brown a list of checks. Mankarious told Brown to destroy records. Mankarious went so far as to meet with Brown and practice the story. Mankarious gave Brown $8,000—from himself and Murphy—and explained that Brown was a "good guy" who was doing his job to cover up the scheme.

Beyond their schemes with UPEC and MBI, Mankarious and Murphy also bilked money out of Delta by submitting their own false invoices directly to the company. For instance, Murphy billed the company for aluminum siding, a concrete driveway, a remodeled porch, and a roof. Mankarious also billed Delta for a driveway. Both men submitted company credit card bills for personal purchases. Mankarious purchased an $1,800 gun safe and $1,000 worth of shooting supplies. Murphy purchased over $9,700 worth of guns and supplies. Delta's bookkeeper, Mark Teloh, questioned these items, but Mankarious and Murphy told him not to challenge their decisions. They told Teloh to enter the items as corporate expenses.

Mankarious and Murphy, of course, reported none of their ill-gotten gains on their federal income tax returns. Interestingly, despite their embezzling, Delta was nevertheless profitable, meeting its goals each year and increasing in value.

Mankarious and Murphy present a completely different—and unconvincing—version of the facts in their briefs. Not only do they ignore the adverse facts as determined by the jury, they present their facts—taken from cross-exams of government witnesses and direct exams of defense witnesses—as uncontroverted reality. The government charitably refers to the defense's factual recitation as an " 'alternate version' of the trial." We are inclined to agree. Criminal defendants, of course, face an especially delicate task when presenting "the facts" to an appellate court. We hasten to add, however, that mentioning adverse factual findings is not the same thing as admitting to the conduct alleged by the government; nor does mentioning adverse findings preclude a defendant from explaining his or her own interpretation of the evidence.

For what it's worth, the defendants contend that Brown cashed the checks at the Brat N Beer and that Brown fabricated the false invoices on his own. Mankarious and Murphy base this assertion on testimony from three witnesses—all seriously undermined by the government's cross-examinations. At trial, defense witnesses testified that some UPEC invoices did not include inflated prices. Mankarious and Murphy contend that the money flowing between UPEC and the fireworks companies constituted loans. At trial Mankarious explained that his large cash holdings (much of it buried in his backyard) were for his family in case something happened to him. Murphy, who did not testify, also buried money because it was a good way to "diversify" one's holdings. The defense attempts to explain away the dealings with Green by contending that Mankarious and Murphy were unwitting dupes who got sucked into Green's fraudulent schemes. Again, they claim that the money flowing to the fireworks companies constituted loans. Finally, the defense attempts to rebut charges of tax fraud by noting evidence that Murphy instructed his CPA to add some $13,000 to his income in 1992.

In any event, the various schemes of Mankarious and Murphy came to light because of the government's investigation of Green and MBI. In May of 1995 the government indicted Mankarious and Murphy for mail fraud, wire fraud, and tax fraud. In September a superseding indictment amended the charges to eight counts of mail fraud (18 U.S.C. § 1341), five counts of wire fraud (18 U.S.C. § 1343), eight counts of money laundering (18 U.S.C. § 1956(a)(1)(B)(i)) against Mankarious and three counts of money laundering against Murphy, and two counts of filing false tax returns (26 U.S.C. § 7206(1)). The indictment included other participants in the scheme and some other counts, but these counts and parties were severed or dismissed. Before trial the court dismissed the mail fraud counts on the grounds that the government did not prove that the mailings furthered the fraud. Also, shortly before trial the government amended a portion of the indictment's wire fraud preamble.

On September 5, 1996, a jury convicted Mankarious and Murphy of all the remaining counts of wire fraud, money laundering, and tax fraud. Following the convictions the court dismissed two of the money laundering counts (counts 9 and 10) against Mankarious on the grounds that the government did not introduce sufficient evidence to prove the predicate offense of mail fraud for those charges. Mankarious and Murphy received 70–month sentences for the money laundering counts, 60–month sentences for the wire fraud counts, and 36–month sentences on the tax fraud counts. The court ordered concurrent time, for an effective sentence of 70 months. The court also ordered supervised release of 3 years, fines of $500,000 each, and joint and several restitution to Delta of $516,-249.

■ In their first challenge to the convictions, Mankarious and Murphy allege that the government impermissibly amended the wire fraud portion of the indictment. Specifically, the defendants argue that the government did not merely strike surplusage from the indictment as it told the court when it requested the amendment.

The amendment to the indictment made three changes. First, it deleted the second paragraph of the preamble to the wire fraud charges. That paragraph read: "Mankarious instructed Roger Green to create fraudulent and inflated invoices from Metal Brokers which were submitted to Delta for aluminum purportedly sold by Metal Brokers to Delta." Second, it deleted a "the" from the third paragraph: "Mankarious and Murphy, using their corporate positions at Delta caused Delta to pay *the* bogus Metal Broker invoices." (Emphasis added.) Third, the amendment deleted the fifth paragraph which included the amount of money Mankarious and Murphy allegedly received.

The defense contends that these changes broadened the wire fraud portion of the indictment without the support of evidence introduced before the grand jury and thus deprived the defendants of their Sixth Amendment right to an indictment. *See United States v. Crockett*, 979 F.2d 1204, 1210 (7th Cir.1992). The core of this argument is that the government's main theory

before the grand jury was that MBI never actually moved any metal. Later the government learned from Green that MBI really did ship metal. The government was stuck with an indictment that described one theory but wanted to argue a different theory at trial. Thus the defendants argue that the government impermissibly broadened the indictment in violation of *United States v. Leichtnam*, 948 F.2d 370, 375–76 (7th Cir. 1991). According to the defendants, this error was fundamental because it amended an essential element of the offense. *See United States v. Pedigo*, 12 F.3d 618, 631 (7th Cir. 1993). The defendants admit that they did not object to the amendment at trial, but they contend that the government belatedly supplied them with the grand jury transcripts, thus excusing their failure to speak up sooner.

The government effectively responds to these arguments. First, the government notes that the district court held a post-trial hearing to consider this issue and determined that the evidence before the grand jury encompassed several theories of the offense. The government reminds us that we should review this factual determination for clear error only. Second, the government explains that the amendment did not broaden the indictment because it modified only the preamble, not the specifics of any actual offense.

The government explains that the confusion regarding the evidence before the grand jury arose because of the several different names applied to the Green/MBI fraud scheme. The government concedes that it did not describe the scheme as an "accounts receivable financing" plot to the grand jury. But the government points out that it did present all the facts to the grand jury under the moniker of the "dash invoice" system. The government also explains that the amendment to the indictment falls within the zone of redactions permitted by *United States v. Quintanilla*, 2 F.3d 1469, 1475 (7th Cir.1993), which allows amendments unless they change a material element of the indictment and cause prejudice to the defendant. In addition, the government walks through the five-factor test laid out by the Tenth

Circuit in *United States v. Cook*, 745 F.2d 1311, 1316–17 (10th Cir.1984), for analyzing deletions from an indictment. Under *Cook* a deletion: (1) may not strike any portion of the charging paragraph, (2) may not change the charged offense, (3) must be definite and certain, (4) may not take the defendant by surprise, and (5) may not prevent the defendant from introducing evidence available before the change. As the government explains, the amendment did not touch the charging paragraphs and did not alter the charges in the wire fraud counts. The amendment was definite and certain—the accompanying trial memorandum specified two theories upon which the government would rely at trial. The defendants suffered no surprise because the discovery materials included all of the underlying information and the court approved the amendment over 90 days before trial. Finally, the amendment did not deprive the defendants of any evidence.

■ The government fleshes out its argument by explaining that the defense waived any objection to the indictment by not raising it earlier. By not objecting before trial, the defense waived the issue unless the indictment was so defective that it did not, under any reasonable construction, charge the offense of conviction. *See Lemons v. O'Sullivan*, 54 F.3d 357, 363 (7th Cir.1995). Furthermore, a defendant must show cause and an actual miscarriage of justice to overcome waiver. *See United States v. Simone*, 931 F.2d 1186, 1192 (7th Cir.1991). As the government notes, even if the defense shows cause, it cannot show a miscarriage of justice. Nothing in the defense case constituted a substantive defense to wire fraud. The defense simply argued that the government witnesses lied.

The amendment may have altered the substance of the indictment slightly by modifying the government's theory of fraud for the mail fraud counts, but it did not change the specifics of any of the *charges*, nor did it prejudice the defendants. The government's argument before and after the amendment relied on the same essential evidence. As the district judge explained: "The grand jury heard testimony concerning a broad range of mail and wire fraud schemes covered by false and fraudulent invoices. This was generally and in the Court's view clearly presented to the defendants in discovery." We will not hold it against the government that it used one label to describe the evidence before the grand jury and then improved on that description before trial. This change seems to have taken place because the government's understanding of the case grew as the trial approached, not because the government's evidence changed. Importantly, the government avoided any prejudice by informing the defense of this change in its approach by providing the defense with a trial memorandum. Therefore, because the amendment did not alter the balance significantly, we do not need to address the question of waiver.

Next, the defense makes several arguments for reversing the money laundering convictions based on mail fraud—counts 11–17. These convictions arose either out of Mankarious cashing checks at the Brat N Beer or out of the defendants depositing checks into their fireworks companies' accounts. The defendants contend that because the court dismissed the mail fraud counts in the superseding indictment, the government lacked evidence of predicate offenses necessary for money laundering. The indictment contained no identified mailings other than those in the dismissed charges. Next, the defendants argue that the government failed to give sufficient notice of specific mailings underpinning the money laundering counts. They also claim that the court allowed the jury to convict based on a "mail fraud scheme" rather than on specific mailings. And finally, they challenge the sufficiency of the evidence that any specific mailings took place. They contend that Brown delivered all of the relevant invoices by hand and received payment by hand.

The government responds by explaining that in *United States v. Gabel*, 85 F.3d 1217 (7th Cir.1996), we stated that money laundering does not require particular proof of a specific predicate offense. As we declared in *Gabel*:

The offense of money laundering is the act of designing a transaction to conceal or disguise the nature or other identifying

features of the property. This Court has held that the government is not required to trace the proceeds to a particular sale. *United States v. Jackson*, 983 F.2d 757, 766 (7th Cir.1993). Put differently, this offense focuses on the conversion of the fruits of the earlier crimes into other, presumably less detectable, forms. The particular nature or time of those earlier crimes is immaterial.... While the statute requires that the money laundered be the fruit of an illegal act, there is no requirement that the government link the money laundered to a specific criminal act.

85 F.3d at 1224.

Similarly, in *United States v. Kennedy*, 64 F.3d 1465 1480 (10th Cir.1995), the Tenth Circuit upheld a money laundering conviction predicated on mail fraud even though the jury acquitted the defendant of mail fraud itself. The *Kennedy* court explained that the jury could have inferred the predicate act supporting the money laundering offense from the overall fraudulent scheme—in other words, the jury could have looked to a different mailing than the one specifically charged in the mail fraud count.

And, in *United States v. Tencer*, 107 F.3d 1120, 1130–32 (5th Cir.), *cert. denied*, —— U.S. ——, 118 S.Ct. 390, 139 L.Ed.2d 305 (1997), the Fifth Circuit took basically the same approach by affirming money laundering convictions after reversing mail fraud counts. The *Tencer* court reversed the mail fraud convictions because the government lacked evidence connecting specific instances of fraud with specific mailings. But the court explained that, given the volume and scope of the insurance fraud scheme in that case, the jury could have inferred that each of the money laundering transactions involved proceeds of mail fraud. As the *Tencer* court stated: "Because the money laundering counts do not define 'specified unlawful activity' in terms of the mail fraud activities described in counts 2–18, this court is not limited to considering only those activities." *Id.* at 1131. In other words, the court affirmed the money laundering convictions on the grounds that the evidence generally supported the inference

that the laundered funds constituted the proceeds of mail fraud.

■ To some extent these cases all beg the question. How much proof of the predicate offense does the money laundering statute require? The government must prove that the defendant conducted a financial transaction "which in fact involves the proceeds of specified unlawful activity." 18 U.S.C. § 1956(a)(1). In *United States v. Blackman*, 904 F.2d 1250, 1257 (8th Cir. 1990), the Eighth Circuit explained that money laundering based on the predicate offense of drug dealing does not require proof of a particular sale. Instead, *Blackman* allowed conviction based on circumstantial evidence that the funds in question came from drug dealing. Of course the *Blackman* court added that the circumstantial evidence must be "sufficient to prove that element beyond a reasonable doubt." *Id.* In *Blackman* the court explained that the jury heard enough pieces of evidence to infer that the funds in question came from drug dealing.

Our resolution of *United States v. Jackson*, 983 F.2d 757 (7th Cir.1993), runs parallel to the Eighth Circuit's approach in *Blackman*. In *Jackson* we explained the inferences supporting a jury verdict of money laundering: The jury could conclude that Errol Jackson used drug dealing proceeds to purchase a car based on testimony that Jackson engaged in drug dealing coupled with evidence of Jackson's unexplained wealth. *See id.* at 766–67. The *Jackson* court, like the Eighth Circuit in *Blackman*, concluded that circumstantial evidence and reasonable inferences based on that evidence could satisfy the predicate offense element in § 1956. *Jackson* thus concluded by noting that the money laundering statute does not require the government to trace the laundered proceeds to a specific predicate offense.

■ In this case, the jury heard testimony from Mary Sikes–Brown, a UPEC employee who said that after she typed invoices she routinely mailed them. She specifically testified to mailing the invoice for work on the gun safe dollies. The government also points to testimony that Delta regularly date-stamped incoming mail and that many of the invoices in question bear date stamps. The

government also notes the timing of date stamps on many invoices-often several days after the invoice date. These facts constitute sufficient circumstantial evidence for the jury to infer that UPEC mailed a file copy of each invoice to Delta. In other words, the jury could have inferred that the laundered funds came from a fraudulent scheme and that the use of the mails furthered that scheme. Therefore, we believe that the jury heard sufficient circumstantial evidence to infer that each of the checks cashed and deposited by the defendants constituted the proceeds of mail fraud.

■ We also reject the defendants' argument that the district court's dismissal of the mail fraud counts mandates the reversal of the money laundering convictions. As *Jackson* makes clear, a money laundering conviction does not require proof of a specific predicate offense; it merely requires proof that the laundered funds constituted the proceeds of a predicate offense. Since a money laundering conviction does not require proof of a specific offense, we fail to see how the dismissal of the specific mail fraud charges had any effect on the money laundering counts. As in *Tencer*, the mail fraud counts detailed specific conduct while the money laundering counts did not. The money laundering counts in the indictment referred only in general terms to "specified unlawful activity, that is mail fraud." This case might come out differently, however, if the money laundering counts in the indictment specified particular predicate offenses. Indeed, two of the district court cases cited by the defendants bear out exactly this point. *See United States v. Finn*, 919 F.Supp. 1305, 1351–52 (D.Minn.1995), *aff'd. on other grounds*, 121 F.3d 1157 (8th Cir.1997), *cert. denied*, —— U.S. ——, 118 S.Ct. 1046, 140 L.Ed.2d 111 (1998); *United States v. D'Alessio*, 822 F.Supp. 1134, 1146 (D.N.J.1993).

■ Based on the foregoing reasoning, we disagree with the defendants that the indictment contained insufficient notice. It is a logical corollary of *Blackman*, *Jackson*, and *Tencer* that if we do not require proof of a specific predicate offense to support a money laundering conviction, then we do not require

the indictment to specify the predicate offense underlying a money laundering charge.

■ Turning briefly to the money laundering jury instructions: We might wish that the district judge had described the predicate offense with more precision rather than telling the jury that it must find that the allegedly laundered funds came from a "mail fraud scheme." District courts would do better to instruct a jury that it must find (perhaps based on inference from circumstantial evidence) that the funds involved in a money laundering offense must constitute the proceeds of a fraudulent scheme that was furthered by the knowing use of the mails. Nevertheless, we do not believe that the instruction constituted error. Because of our willingness to allow the jury to infer the predicate offense from circumstantial evidence, and because we do not require the indictment to specify the predicate offense, we believe that even this fuzzy instruction captured the essence of the predicate offense adequately. The instruction directed the jury's attention to both critical components: the scheme to defraud and the use of the mails to execute the plan.

■ Perhaps anticipating their failure on these various points, the defendants attack the money laundering convictions from yet another angle. They argue that the government lacked evidence of a predicate mailing prior to the date of each money laundering charge. The defendants argue that, under Kennedy, the predicate act of mail fraud must be "complete" before the money laundering occurs. *See Kennedy*, 64 F.3d at 1477. The defendants are correct that many cases, including *Kennedy*, use the language of time to describe the relationship between the money laundering and the predicate offense—these cases state that the predicate offense must be "completed" or "earlier" or "antecedent." *See, e.g., United States v. Cabrales*, —— U.S. ——, ——, 118 S.Ct. 1772, 1773, 141 L.Ed.2d 1 (1998) (stating that the money laundering statutes "interdict only the financial transactions ... not the anterior criminal conduct that yielded the funds allegedly laundered"); *United States v. Christo*, 129 F.3d 578, 580 (11th Cir.1997) ("the underlying criminal activity must be *complete*

before money laundering can occur"); *United States v. Savage*, 67 F.3d 1435, 1442 (9th Cir.1995) (describing proceeds as "funds obtained from prior, separate criminal activity"), *cert. denied*, 516 U.S. 1136, 116 S.Ct. 964, 133 L.Ed.2d 885 (1996); *United States v. Johnson*, 971 F.2d 562, 569 (10th Cir.1992) ("One might logically infer that Congress could have intended § 1957 to apply when the underlying criminal activity occurs simultaneously with a monetary transaction with the proceeds of the activity.... Yet, both the plain language of § 1957 and the legislative history behind it suggest that Congress targeted only those transactions occurring after proceeds have been obtained from the underlying unlawful activity."); *United States v. Edgmon*, 952 F.2d 1206, 1214 (10th Cir.1991) ("Congress aimed the crime of money laundering at conduct that follows in time the underlying crime rather than to afford an alternative means of punishing the prior 'specified unlawful activity.' ").

■ These cases, however, typically involve a very different question from the one confronting us. For instance, in *United States v. Christo*, 129 F.3d 578 (11th Cir. 1997), the Eleventh Circuit dealt with the laundering, under 18 U.S.C. § 1957, of proceeds obtained from bank fraud. The government contended that the act of depositing checks in a check kiting scheme constituted money laundering. The defendant countered by arguing that, because the predicate offense of bank fraud required execution (i.e., the movement of funds from the financial institution), the money allegedly laundered did not constitute the proceeds of crime until after the deposit. In other words, the defendant claimed that the last act of bank fraud could not have constituted the money laundering transaction—the two offenses needed to be separate. The *Christo* court agreed and stated that "the underlying criminal activity must be *complete* before money laundering can occur." 129 F.3d at 580. When the *Christo* court used the language of time, however, it really was just worried about the definition of proceeds. The Eleventh Circuit explained that the money laundering statutes punished transactions in proceeds, not the transactions that create those proceeds. Thus, time is important, but in a different

way than Mankarious and Murphy allege. A money launderer must obtain proceeds *before* laundering can take place. The holding paragraph explains the court's concern:

> Viewing the evidence in the light most favorable to the government, we concluded that these facts are insufficient to establish that [the defendant] engaged in a monetary transaction that was separate from and in addition to the underlying criminal activity. The check kite did not deprive the bank of anything, nor did [the defendant] unlawfully obtain something from the bank, until Bay Bank disgorged its funds by the payment of the check to SouthTrust Bank. Thus, the withdrawal of funds charged as money laundering was one and the same as the underlying criminal activity of bank fraud and misapplication of bank funds. We do not accept that money laundering is inherent in bank fraud or misapplication of funds. We do not understand Congress to have been so subtle when it enacted the money laundering statute.

*Id.*

Similarly, in *United States v. Johnson*, 971 F.2d 562 (10th Cir.1992), the Tenth Circuit considered basically the same problem in a case involving the laundering, also under § 1957, of funds derived from wire fraud. The government identified the wire deposit of funds into the defendant's account as the money laundering transaction. The defendant countered that he could not have engaged in a transaction in criminally derived property because he did not possess the proceeds of wire fraud until after the completion of the wire transfer. The court agreed. Like the *Christo* court, however, the Tenth Circuit used the language of time to express this conclusion: "Whether or not the funds that were wired to the defendant were 'criminally derived property' depends upon whether they were proceeds obtained from a criminal offense at the time the defendant engaged in the monetary transaction. We find they were not." 971 F.2d at 569–70.

In both *Christo* and *Johnson*, the courts confronted a problem arising out of attempts to define what the money laundering statues

refer to as "proceeds of specified unlawful activity," 42 U.S.C. § 1956, or "criminally derived property," 42 U.S.C. § 1957.[1] Both courts held that money laundering criminalizes a transaction in proceeds, not the transaction that creates the proceeds. Bank fraud does not generate its proceeds until after execution. Wire fraud often does not give rise to proceeds until after a wire transfer. These cases stand for the rule that the predicate offenses must produce proceeds before anyone can launder those proceeds.

When, then, does mail fraud produce proceeds? In two seminal mail fraud cases the Supreme Court has explained that a fraud scheme can produce proceeds long before the mailing that triggers federal jurisdiction. In *United States v. Sampson,* 371 U.S. 75, 83 S.Ct. 173, 9 L.Ed.2d 136 (1962), the Court reinstated a number of mail fraud counts after the district court dismissed them on the ground that the mailings were not for the purpose of executing a business fraud scheme. In the scam the defendants solicited business, accepted applications for service, obtained payment, and then mailed out official acceptances to the victims. Importantly, the defendants obtained all the money they expected to ever get from each victim before ever using the mails. The *Sampson* Court explained that this conduct could constitute mail fraud because the defendants contemplated that the mailed acceptances would lull the victims into believing that the defendants would faithfully perform the paid-for services. *See id.* at 79–81, 83 S.Ct. 173. The Court reached much the same conclusion in *Schmuck v. United States*, 489 U.S. 705, 109 S.Ct. 1443, 103 L.Ed.2d 734 (1989). In *Schmuck*, the Court affirmed a mail fraud conviction arising out of a used car fraud operation. In the scheme, Schmuck rolled back the odometers on used cars and then sold the cars to dealers. When the dealers sold the cars to retail customers, they would mail a title application to the state. The Court ruled that, even though Schmuck had

long since obtained his money, the mailing arguably furthered his scheme by maintaining his successful, long-term relationship with the car dealers. *See id.* at 710–15, 109 S.Ct. 1443.

Thus, in both *Sampson* and *Schmuck*, the Supreme Court held that the mailing in a mail fraud case may further the fraudulent scheme even if it occurs long after the scheme generates proceeds. In both cases, the mailings achieved an important purpose-they preserved the appearance of propriety, even if they did not actively cause the loss of money. *See United States v. Brocksmith*, 991 F.2d 1363, 1367–68 (7th Cir.1993). The mailings kept everything copacetic. In our case the mailings served the same purpose. UPEC mailed file copies of the invoices to Delta. These mailings maintained normal business operating procedures and thus furthered the fraudulent scheme. Of course by the time UPEC mailed the invoices, Mankarious and Murphy often already had cashed their kickback checks.

To sum up: Bank fraud creates proceeds only after execution. Wire fraud often creates proceeds only after a wire transfer. A mail fraud scheme, however, can create proceeds long before the mailing ever takes place. Mankarious and Murphy are asking us to suspend the operation of the money laundering laws between the time a fraud scheme obtains proceeds and the time that scheme employs the mails. None of the cases cited justifies such an incredible result. *Christo, Johnson,* and all the other cases compel us to keep money laundering and the predicate offenses separate. Money laundering requires proceeds of a discrete predicate crime. That predicate crime must have produced proceeds in acts distinct from the conduct that constitutes money laundering.

Nothing in our reasoning creates an irresolvable conflict with the Tenth Circuit's decision in *Kennedy*. The potential for trouble

---

1. While the two statutes use different terminology, we believe their general similarity of purpose allows us to apply the logic of *Christo* and *Johnson* to this case. We might face a more difficult question if we were dealing with an issue that revolved around the precise meaning of "proceeds" as opposed to "criminally derived proper-

ty." *But see* United States v. Savage, 67 F.3d 1435, 1442 (9th Cir.1995) (concluding that " 'criminally derived property' under § 1957 is equivalent to 'proceeds' under § 1956"), *cert. denied,* 516 U.S. 1136, 116 S.Ct. 964, 133 L.Ed.2d 885 (1996).

arises because *Kennedy* concerned money laundering based on mail fraud and because the opinion stated: "All that is required to violate § 1956 is a transaction meeting the statutory criteria that takes place after the underlying crime has been completed." *Kennedy*, 64 F.3d at 1477. As we read *Kennedy*, however, the Tenth Circuit was merely reaffirming the proceeds rule announced in Johnson—a money laundering transaction must follow and must be separate from any transaction necessary for the predicate offense to generate proceeds. The *Kennedy* court faced a case, unlike this one, in which mailing occurred before laundering. Therefore, it did not face the same situation we confront here.

In this case, the defendants' schemes generated proceeds and then Mankarious and Murphy committed separate acts to launder those proceeds. Because, as we already explained, money laundering does not focus on the specifics of the predicate offense, it does not matter when all the acts constituting the predicate offense take place. It matters only that the predicate offense has produced proceeds in transactions distinct from those transactions allegedly constituting money laundering. Therefore, on this score, we affirm the money laundering convictions.[2]

 Despite all of this heavy lifting, we are not quite done with the defendants' challenge to the money laundering convictions. Mankarious and Murphy point out that the money laundering charges focused on transactions involving checks, rather than cash. They claim that the checks did not become "proceeds" until after being deposited or cashed. In the abstract, this is an interesting argument.[3] *But see United States v. Haun*, 90 F.3d 1096, 1101 (6th Cir.1996) (construing "proceeds" under § 1956 and stating

that "despite defendant's suggestion, there is no doubt that the checks he received from the sales of the automobiles fall within the common understanding of 'proceeds of specified unlawful activity'"), *cert. denied*, —— U.S. ——, 117 S.Ct. 691, 136 L.Ed.2d 614 (1997); *United States v. Li*, 856 F.Supp. 411, 416 (N.D.Ill.1994) (finding that checks constitute proceeds under § 1956).

The money laundering charges in this case, however, do not focus on the checks obtained from Delta; instead the grand jury charged the defendants for cashing and depositing kickback checks from UPEC after Brown obtained payment from Delta. Thus the defendants' argument utterly fails. At the latest, UPEC obtained the proceeds of fraud when it deposited Delta's checks into its account. (We recognize that it takes time for checks to clear and for funds to become available, but the defendants do not claim that any of the checks in this case failed to clear. Therefore, while it might have taken some time to move the electronic funds, the funds did follow the checks.) When Brown wrote the checks in the money laundering counts he intended to cover those checks with tainted money deposited in UPEC's account. In counts 11–13, Brown wrote checks to fictitious payees in order to give Mankarious and Murphy their kickbacks. In counts 14–17, Brown wrote the kickback checks directly to one of the fireworks companies. When Mankarious cashed the kickback checks at the Brat N Beer, and when Mankarious and Murphy deposited the checks into the accounts of their fireworks companies, the defendants obtained the proceeds of crime by drawing money out of UPEC's tainted account. Therefore, the transactions in counts 11–17 all involved the eventual, surreptitious movement of dirty money.

---

2. Mankarious cannot be too unhappy with this outcome, however. Apparently the government did not raise either *Sampson* or *Schmuck* until appeal. Thus the government allowed the defendants' argument to sway the trial court, which dismissed Mankarious' convictions on two money laundering counts (counts 9 and 10) based on the purported timing flaw. The government does not appeal this result.

3. The issue would be clearer if the government charged a jewel thief with money laundering

under § 1956 based on the thief trading stolen diamonds for a Porsche. *But see* United States v. Werber, 787 F.Supp. 353, 355–57 (S.D.N.Y.1992) (applying § 1956, defining "proceeds" broadly, and allowing a money laundering conviction based on the sale of automobiles obtained with counterfeit cashier's checks). The issue might be much easier under § 1957 because that statute refers to "criminally derived property" rather than "proceeds."

Thus we affirm the money laundering convictions in counts 11–17 without directly answering the question of whether a check (or another kind of personal property other than cash) could constitute "proceeds" under § 1956(a)(1)(B)(i).

■ Following their attempt to topple the money laundering convictions based on mail fraud, the defendants move on to challenge their convictions for wire fraud and for money laundering based on wire fraud. They allege, in general, that the government lacked sufficient evidence of their involvement in a scheme to defraud and that the government lacked a sufficient nexus between the invoices in question and the alleged fraudulent scheme. Regarding specific counts, the defendants contend that the government lacked evidence that the phone calls supporting counts 21 and 25 furthered a fraudulent scheme (even though those phone calls took place between Delta and MBI just hours before MBI issued kickback checks). They allege that the government has no evidence that the wire activity supporting counts 23 and 24 connect to the fraudulent scheme. And they claim that the government's proof on count 22 is insufficient because the wire transfer does not match the alleged amount of fraud. Finally, they contend that the insufficient proof of wire fraud undermines the government's proof of money laundering predicated on wire fraud in counts 26 and 27.

The government admits that there is nothing illegal about accounts receivable financing per se, but it explains that the defendants used the system to provide Green with operating capital for his fraud and to pay him inflated commissions (out of which he paid the defendants kickbacks). The government rebuts the defendants' other claims by walking through the facts and showing that the phone calls in counts 21 and 25 correlate with specific checks covering fraudulent invoices or kickbacks. This correlation supports an inference that the calls furthered the illegal conduct. Regarding count 22, the government notes that it involves a wire transfer to Sam's Trading, which according to Green's testimony performed no real work for MBI—the transfer was a kickback. Regarding

counts 23 and 24, the government explains that these wire transfers from Gamma constituted wire fraud because Green admitted that Gamma existed only to further the fraudulent scheme. Consequently, both of the money laundering counts (26 and 27) also survive because they both rest on checks from Gamma—which used wire transfers to further its operations. While the government's case relies to some extent on inference, we do not find anything unreasonable in the jury's verdicts on counts 21–27.

■ Proceeding alone, Murphy challenges the sufficiency of the evidence behind all of his convictions except one of the tax fraud counts. First, Murphy alleges that he was not involved in the UPEC scheme. He admits that he appeared at a few meetings, but he contends he was convicted through guilt by association. Regarding the Green scheme, Murphy notes that Green had little to say about Murphy and that Murphy should not be held responsible for Mankarious' acts. With regard to the 1991 tax count, Murphy contends that no one testified to him receiving money during that tax year.

We easily dismiss these arguments. The government points us to several references by Brown to meetings with Mankarious and Murphy. The government also notes that Murphy signed checks with Mankarious. And the government reminds us of Murphy's role in the cover-up. Regarding the Green operation, the government notes that Murphy's fireworks company invoiced Green, that Mankarious' fireworks company wrote checks to Murphy's fireworks company splitting a big kickback payment from Green, that Murphy directed Ms. Witte in running Parkfield, and that Green sent a Gamma check for Parkfield to Murphy's home. Regarding the 1991 tax fraud, the government explains that Murphy co-signed the checks Delta sent to UPEC and that Mankarious told Brown on several occasions that he split the proceeds with Murphy (although on other occasions he told Brown to keep the checks secret). Further, as the government states, Murphy's involvement in the 1992 scams and his cover-up efforts give rise to an inference that he did indeed participate equally in the 1991 portion of the scam. In short, we find

the jury's verdict based on adequate evidence of Murphy's involvement in all aspects of the various offenses.

Murphy also raises three losing challenges to his tax fraud convictions. First, he contends that the trial court should have given a good faith instruction. *See Cheek v. United States*, 498 U.S. 192, 202, 111 S.Ct. 604, 112 L.Ed.2d 617 (1991). The government responds that Murphy introduced no evidence showing that he believed that he was complying with the law and that, because the offenses involved willfulness, a good faith instruction was unnecessary. *See United States v. Kelley*, 864 F.2d 569, 573 (7th Cir. 1989). Next, Murphy contends that the indictment required the government to prove that Murphy's tax fraud "caused him to underpay his federal income taxes." The government admits that the indictment contained this language but contends that the law requires no such proof. *See* 26 U.S.C. § 7206; *cf. Sansone v. United States*, 380 U.S. 343, 352, 85 S.Ct. 1004, 13 L.Ed.2d 882 (1965). Furthermore, the government notes that the case law excuses the prosecution from proving the exact amount of a tax underpayment even when the indictment specifies such an underpayment. *See United States v. Warden*, 545 F.2d 32, 36 (7th Cir. 1976). Lastly, Murphy contends that the government presented surprise evidence against him by introducing evidence of money derived from Parkfield, the money spent on the home improvements, and the money spent on gun equipment as evidence of Murphy's tax liability. The government responds by explaining that it presented this evidence to Murphy as it was discovered.

Overall, Murphy's arguments get him nowhere. We would be uncomfortable with the government's late announcement of evidence, but we suspect that Murphy's real complaint is that he didn't understand that the government would use certain mail and wire fraud evidence against him in its tax fraud case.

■ Mankarious also makes a challenge on his own. He complains that the trial court erred by not severing his trial from Murphy's. Mankarious focuses this argument on testimony regarding Murphy's use of contractors at his home (and Murphy's personal use of his company credit card and checkbook) and the subsequent submission of those bills to Delta. While the judge gave a limiting instruction to the jury relating to most of this testimony, Mankarious claims that the judge failed to give the instruction on every occasion and that, even with the instruction, the testimony prejudiced him. *See United States v. Moore*, 115 F.3d 1348, 1361 (7th Cir.1997) (explaining that a defendant challenging the denial of a severance motion must establish actual prejudice resulting from the denial). Regarding prejudice, Mankarious points to the government's closing argument that Mankarious knew of Murphy's conduct and that Murphy's conduct exemplified the modus operandi of the defendants' fraudulent schemes.

The government responds that we must presume that the jury followed the limiting instruction, *see* United States v. Richardson, 130 F.3d 765, 777 (7th Cir.1997), *cert. denied*, —— U.S. ——, 118 S.Ct. 1324, 140 L.Ed.2d 486 (1998), and that the jury heard the instruction often enough to understand that it needed to consider the evidence separately against each defendant on each count. The government explains that the closing argument in question focused on Murphy, not Mankarious. And the government notes that Mankarious did not object to the closing and, therefore, must show plain error.

We do not believe the district judge abused his discretion in denying severance. Quite properly, the judge repeatedly gave limiting instructions. Mankarious cannot demonstrate actual prejudice because of the overwhelming evidence against him. The few mentions of independent criminal conduct by Murphy (usually accompanied by a limiting instruction) and the brief mention of this conduct in closing cannot be said to have significantly affected Mankarious' chances of an acquittal. The trial lasted over 4 weeks, and these few glitches (if they even amount to glitches) did not prejudice Mankarious.

■ We have now exhausted, at long last, the defendants' attacks on their convictions, and so we turn to consider their numerous claims of improper sentencing. The first of these sentencing arguments is quite interest-

ing. Mankarious and Murphy claim that the court should not have based the amount of loss (under U.S.S.G. sec.2F1.1) on the entire loss to Delta because they owned 59 percent of it and cannot steal from themselves. In other words, the defendants contend that the court should have reduced the amount of loss by 59 percent. Similarly, the defendants contend that the court should have reduced their money laundering liability by the same percentage.

The government explains that this argument might fly if Delta were a partnership. Because Delta is a separate corporate entity, however, the defendants should face liability for the full loss. While we generally agree, we hesitate about endorsing the proposition as a blanket rule. For instance, if hypothetical defendants treated a corporation as an alter ego (in other words, if a veil-piercing argument would work against them), then we speculate that they might be able to use the theory of veil piercing as a defense. *Cf. Quinn v. Butz,* 510 F.2d 743, 759 (D.C.Cir. 1975). Nevertheless, it seems appropriate to hold a co-owning corporate embezzler responsible for the full amount of loss if the corporation follows formalities, if it has other active co-owners, and/or if the defendant in question receives a salary and benefits tightly controlled by the co-owners. We do not mean to require the presence of all these factors, nor do we mean to suggest that this list is exhaustive. This case would be very different, however, if not for the presence and role of WITECH. In this case WITECH acted as a fully participating co-owner. WITECH demanded that Delta follow corporate formalities, it helped direct Delta, and it closely monitored the compensation of Mankarious and Murphy. These factors establish that Delta constituted an entity separate from Mankarious and Murphy—the defendants stole from the company, not from themselves. Therefore, we find no error in holding them liable for the full amount of their fraud.

With regard to the money laundering, the defendants have no viable argument. The offense itself requires proof that the defendants were concealing ill-gotten gains. As the government points out, the guidelines,

*see* U.S.S.G. § 2S1.1(b)(2), and the case law uniformly state that offense level depends on the amount of money involved in the crime, *see United States v. Atterson,* 926 F.2d 649, 659 (7th Cir.1991).

■ Continuing with their contention that the district court improperly calculated the amount of loss, the defendants contend that the Topper invoice scheme cheated Brown's partners at UPEC & Associates, not Delta. Thus they believe that the losses from this scheme should not have been counted by the court. The government responds by explaining that the Topper scheme constituted part of the same relevant course of conduct as the offenses of conviction. The district court agreed with the government and we agree with the district court. For sentencing purposes, each of the permutations of the invoice scam represents not a distinct set of offenses but just a growth and evolution of the same scheme. Furthermore, while the Topper portion of the scheme cheated UPEC out of payment for its work, it also cheated Delta out of money. UPEC had performed work but remained unpaid and Delta had paid for work but, arguably at least, remained liable to UPEC. Therefore, the district court properly included the Topper invoices in its calculation of the amount of loss.

■ In yet another assault on the district court's loss calculations, the defendants argue that the court should not have counted the $50,000 returned by Mankarious when it totaled up the losses. The PSR did not include this amount and the court added it following an objection by the government. The government explains that the return of funds does not reduce loss computation because the defendants intended the loss and returned the money only because of an emerging investigation. *See United States v. Brown,* 7 F.3d 1155, 1159 (5th Cir.1993); *cf. United States v. Mount,* 966 F.2d 262, 266 (7th Cir.1992). We agree. The defendants not only attempted to obtain the $50,000, they actually did obtain the money.

■ Finally moving on to another sentencing topic, the defendants contend that the trial court improperly enhanced their

offense levels under U.S.S.G. § 3B1.1(c) for supervising Brown. Mankarious and Murphy claim that Brown was a coequal participant rather than an underling. They explain that he possessed authority, he participated equally, he told Hansen (UPEC's comptroller) to further the plot, he initially took a larger share of the proceeds, he assisted in planning and executing the scheme, and he was not controlled by Mankarious or Murphy. *See United States v. Billingsley*, 115 F.3d 458, 464 (7th Cir.1997) (providing factors for analysis of U.S.S.G. § 3B1.1(c) enhancements).

The government explains that the court permissibly looked not just to Brown's role in the scheme, but to his role in the cover-up. The government argues that during this later period Mankarious and Murphy did direct Brown and even paid him for his efforts. The government explains that, in applying the supervision enhancement, the court may look to all relevant conduct, including conduct occurring in the "course of attempting to avoid detection or responsibility for that offense." *Billingsley*, 115 F.3d at 465.

During the active period of the invoice operation, Brown certainly does appear to have acted as a co-equal player. The only facts pointing in the other direction are Brown's initial request for advice on embezzlement and Murphy's offer to teach him the craft. Once the cover-up began, however, Mankarious and Murphy assumed a dominant role. They told Brown what to do and they paid him to do it. Nothing in the sentencing guidelines requires the court to limit the enhancement for supervision to one particular period during a lengthy course of criminal conduct—even if that period lasted the longest. Since Brown's role changed from equal to underling, we believe the enhancement was properly applied.

■ Next the defendants argue that the court improperly enhanced their sentences for obstruction of justice under U.S.S.G. § 3C1.1 based on their attempts to coach Brown regarding what he should say to the FBI. They argue that since a defense investigator subsequently discovered notes in Brown's garbage, and since the defense turned those notes over to the government,

the defendants did not engage in obstruction. They also claim that they did not obstruct justice by tipping off Green during the FBI investigation. More importantly, the defendants argue that the enhancement applies only when a defendant obstructs an ongoing investigation or proceeding, not a potential investigation. *See, e.g., United States v. Lister*, 53 F.3d 66, 69, 71 (5th Cir.1995). Here, the defendants argue they had no knowledge of any investigation of themselves when they began the cover-up.

The government responds that the defendants misperceive the law in this circuit. In *United States v. Laurenzana*, 113 F.3d 689, 696 (7th Cir.), *cert. denied*, —— U.S. ——, 118 S.Ct. 240, 139 L.Ed.2d 170 (1997), the court explained that materiality, rather than timing, was the crucial issue. We think the government clearly prevails. Mankarious and Murphy anticipated that the government's investigation of Green would eventually uncover evidence of crimes at Delta. They attempted to prevent the discovery of those crimes by tipping off Green and by concealing their own conduct. In other words, their efforts were directly material to the investigation of Delta, even though that investigation began later. With regard to their other claims, their helpful production of notes does not erase the past. Once they obstructed justice by launching the cover-up, no amount of angelic behavior could save them from the possibility of facing this enhancement.

■ Regarding the court's calculation of the tax fraud sentences, the defendants claim that the court improperly applied U.S.S.G. § 2T1.1(b)(2), the enhancement for use of sophisticated means in a tax case. The PSR did not recommend this enhancement, but the government urged its application based on the defendants' total conduct in the entire scheme. The defendants contend that the sophisticated means enhancement must be tied to the offense of conviction. *See United States v. Stokes*, 998 F.2d 279, 283 (5th Cir. 1993). They claim that their conduct in committing tax fraud was simple—they just did not report their income from fraud.

As the government explains, however, the defendants' scheme had the dual effect of

creating illicit gain and hiding that gain from the IRS. The court thus permissibly applied this enhancement. Whether or not the defendants consciously intended it, the scheme itself would have thwarted IRS from successfully auditing the defendants and determining their real income. We think that the scheme constituted a sophisticated means of tax fraud, even if that was not its primary purpose. Therefore, the sophisticate means enhancement did relate to the offense of conviction.

The defendants next attempt to revive their sufficiency of the evidence claim as a sentencing argument by attacking the court's determination that their participation in Green's scheme began in April of 1992 rather than in May. The government refutes this contention by pointing to Green's testimony. Since the jury convicted the defendants on all counts, we conclude that it found Green's testimony credible. Therefore, the district court properly relied on this testimony to fix the starting date of the defendants' conduct.

In another attempt to convert their sufficiency of the evidence arguments into a sentencing issue, the defendants contend that the court improperly enhanced their sentences for the relevant conduct of receiving stolen aluminum. The defendants explain that the court dismissed two receiving stolen property counts from the indictment before trial. Furthermore, they argue that Green did not steal all the aluminum—only the portion not paid for at the end of the Ponzi scheme. And the defendants note that one of their witnesses testified that Delta actually paid a premium price for the aluminum. The government rebuts this claim by noting that Green testified that he sold Delta stolen aluminum and that the original producer of the aluminum testified that Green stole the metal from his company. The court clearly heard sufficient evidence to justify its relevant conduct finding.

Turning their attention from upward enhancements to downward departures, the defendants claim that the court misperceived its ability to depart because it believed that the defendants' conduct fell within the heartland of the money laundering offense. The defendants explain that money laundering covers attempts to launder illicit money, not to subsequent transactions involving washed funds. *See United States v. Garcia–Emanuel*, 14 F.3d 1469, 1474 (10th Cir.1994). They seem to believe that their cashing and depositing of checks constituted a subsequent transaction in laundered money rather than the laundering transaction itself. On the contrary, we think that the defendants did launder the money. While they did not legitimate dirty money, they did move dirty money from an auditable account into hiding. Thus their conduct falls under the statute's coverage of attempts to conceal the ill-gotten proceeds of crime.

In their penultimate argument, the defendants contend that the trial judge wrongly believed that he lacked the ability to depart because of the defendants' disparate treatment compared to other participants in the various schemes. The government, however, notes that these other participants cooperated with the government and that Judge Randa stated that he felt that downward departure would undermine efforts to reward individuals for cooperating with the government. The defendants make a good case based on a speech Randa gave regarding congressional intent to limit the discretion of judges. The government, however, points to other remarks suggesting that the judge did exercise his discretion and simply refused to depart. The government correctly identifies comments in which the judge explained his refusal, as opposed to his inability, to depart. The judge's exercise of his discretion prevents review. *See United States v. Wright*, 37 F.3d 358, 360–61 (7th Cir.1994).

Finally, Murphy contends that the court improperly attributed Parkfield's income and the gun equipment purchases to him when it calculated his tax liability. He alleges that he did not own Parkfield, and he claims that the guns constituted legitimate business expenditures. As the government correctly points out, however, Murphy controlled Parkfield and he kept the guns at home as part of his personal collection. Therefore, the financial gains from these two sources plausibly constitute income to Murphy.

Having found no basis to either reverse the defendants' convictions or to recalculate their sentences, the judgment of the district court is AFFIRMED.